606 F.2d 222
 CA 79-3281 MORRILTON SCHOOL DISTRICT NO. 32, Terry A.
Humble, Superintendent, W. O. Byrd, Dr. H. B. White, Hugh C.
Jones, W. C. Maxwell, Earle Love, William Cheek, Members,
Plumerville School District No. 39, Doyle Border,
Superintendent, William P. Evans, Jack Gordon, Frank Deaver,
Charles Townsley, Billy Garrett, Members, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 79-1293.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1979.
Decided Aug. 30, 1979.
 
 Robert V. Light, Friday, Eldredge & Clark, Little Rock, Ark., for appellant Morrilton.
 Felver A. Rowell, Jr., Morrilton, Ark., for appellant Plumerville.
 Frank D. Allen, Jr., Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., argued; W. H. Dillahunty, U. S. Atty., Little Rock, Ark., Drew S. Days, III, Asst. Atty. Gen., and Allen and Walter W. Barnett, Washington, D. C., on brief for appellee U. S.
 Before GIBSON, Chief Judge, LAY, HEANEY, BRIGHT, ROSS, STEPHENSON and McMILLIAN, Circuit Judges, en banc.
 HEANEY, Circuit Judge.
 
 
 1
 The United States brought this civil action on December 27, 1972, pursuant to Section 407 of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6, to desegregate the public schools of Conway County, Arkansas. Named as defendants were the State of Arkansas, the Arkansas State Board of Education and its members, the Director of Education of Arkansas, the Conway County Board of Education and its members and secretary, and each of the six school districts of Conway County[1] and their governing boards and chief administrative officers.
 
 
 2
 Conway County is a predominantly rural county. At the time the complaint was filed, total enrollment of the County's schools was 3,915 students. The racial composition of the student body and faculty of each of the six school districts was as follows:
 
 
 3
 Student Body Faculty
 # White # Black # White # Black
 ---------------- ----------------
Morrilton 2,076 315 96 5
East Side 1 313 1 17
Plumerville 235 151 13 2
Conway County 79 93 6 5
Nemo Vista 282 26 13 0
Wonderview 314 39 18 0
 ------- ------- ------- -------
 2,978 937 147 29
 
 
 4
 Of the 172 Conway County District students, eighty-one black and four white students attended the Center School and were taught by four black and two white teachers. The government alleged that the East Side School District and the Center School of the Conway County District were established by the State of Arkansas as black components of a dual school system in Conway County and had been maintained as all-black vestiges of that dural system.
 
 
 5
 The District Court agreed. Relying primarily on the history of the development of the school districts, and on the nature of the boundaries of each school district, it concluded that the racial segregation present in the East Side District and the Center School of the Conway County District
 
 
 6
 is a continuing result of State imposed racial segregation, and that its present existence is the result of inertia and of lack of State machinery to bring about a change in the situation in a context other than consensual.
 
 
 7
 The court ordered immediate correction of the racial segregation of the Conway School District.[2] It further ordered the defendants to file a plan, or plans, for the elimination of the unconstitutionality of the East Side District.
 
 
 8
 The Morrilton, Plumerville, East Side and Nemo Vista School Districts filed proposed plans. After analysis of those plans, and upon compilation of additional information, the United States submitted alternate plans.
 
 
 9
 A hearing was held by the District Court on the merits of the various proposals on March 1 and 2, 1979. The court entered an order on March 6, 1979, adopting the basic outline of Government Plan B, which provides for the retention of the Wonderview and Nemo Vista Districts with little change and the consolidation of the Morrilton, Plumerville and East Side Districts. Morrilton and Plumerville appealed.
 
 
 10
 The first issue on appeal is the correctness of the District Court's finding of purposeful segregation and the propriety of its order of interdistrict relief to remedy that segregation. Morrilton and Plumerville argue that the all-black condition of the East Side District is not the result of discriminatory action. They further argue that, even assuming the unconstitutionality of the segregation is the East Side District, since the government made no showing that either Morrilton or Plumerville participated in the development of the East Side District as a segregated district, the District Court's imposition of interdistrict relief was unwarranted.
 
 
 11
 At one time, there were over 3,000 school districts in Arkansas. The state gradually required smaller districts to consolidate in an effort to eliminate inefficiency and to insure every child a twelfth-grade education. The school districts of Conway County are the result of a series of three major consolidations, the first occurring in the 1920's, the second in the 1930's and the final one in 1949 under the Initiated Act No. 1 of 1948, Ark.Stat.Ann. §§ 80-426 to -429 (Repl. 1960). The last consolidation was designed to eliminate districts having fewer than 350 students.
 
 
 12
 The Arkansas laws paving the way for consolidations were racially neutral on their face; there was no requirement written into the statutes that districts be consolidated along racial lines.[3] However, from 1868 until the Supreme Court issued its opinion in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), Arkansas law required that separate schools "for white and colored persons" be established by the board of directors of each school district. Ark.Stat.Ann. § 80-509. Prior to the three major consolidations, there were at least ninety-two school districts in Conway County. Most, if not all, were one-school districts and had to be either white or "colored." The requirement that districts maintain separate schools clearly influenced the consolidations which occurred in Conway County in the 1920's, 1930's and 1940's. Black districts tended to consolidate with black districts, and white with white, at least in part to avoid the expense of maintaining separate schools.[4] The influence of § 80-509 is starkly visible on the map showing the boundary lines of the six school districts as they existed in 1972.
 
 
 13
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 14
 The District Court based its finding of purposeful segregation in large part on those boundary lines, saying
 
 
 15
 (t)he geographical arrangement of the Conway County districts resembles a crazy quilt, and the resemblance results from the gerrymandering of district lines in years past in deference to the requirement of segregation; there can be no other explanation for it.
 
 
 16
 The school district map introduced in evidence shows that the Menifee District (East Side), while centered at Menifee, is scattered in fragments all over the eastern and central parts of the County. Parts of it are surrounded by the Nemo Vista, Morrilton, and Plumerville Districts. At one point it is cut in two by Morrilton. The fragments of the Menifee District surrounded by parts of other districts are enclaves of Negroes residing in generally white neighborhoods, and the predecessors of Menifee students residing in those enclaves were explicitly assigned to Menifee on the basis of the fact that they were Negroes.
 
 
 17
 We agree that the pattern of consolidations shows the impact of § 80-509. The Nemo Vista District was the result of the consolidation of fourteen all-white school districts; Wonderview of the consolidation of seventeen all-white districts. East Side was the product of the consolidation of twelve all-black districts. That race was a factor in the pattern of consolidation is evident in the history of one of the older districts: in 1924, S.D. # 5 split into four sections, the all-black Union Special # 87 consolidated with East Side, while the all-white Austin # 72 and Center Ridge # 2 consolidated with Nemo Vista, an all-white district. As a result of this and other consolidations of the black districts into the East Side District, some black children now travel twenty-five miles by bus in each direction, passing predominantly white schools in the process.
 
 
 18
 We recognize that consolidations in three of the six school districts did not occur along strictly racial lines: Morrilton was the result of the consolidation of sixteen white districts, ten mixed districts and one black district; Plumerville, the consolidation of four white districts, one black district and one mixed district; and Conway County, the consolidation of seven white districts and two black districts. However, the map clearly shows that absent racial considerations, several areas would have consolidated with Morrilton, Nemo Vista or Plumerville instead of East Side.
 
 
 19
 The case closest on its facts to this case is Haney v. County Board of Education of Sevier County, Arkansas, 410 F.2d 920 (8th Cir. 1969). There, fourteen school districts consolidated in 1949 to form one black district (Sevier County) and one mixed district (Lockesburg). Black children from the Lockesburg District attended the Sevier County schools until 1954 and 1955, when, at the initiative of the Superintendent of the Lockesburg District, the Sevier County Board of Education approved the transfer of the property of black property owners to the Sevier County District. This resulted in the Sevier School District having irregularly shaped and noncontiguous areas. We held under the circumstances that
 
 
 20
 (s)chool district reorganization took place under the color of state law that then required segregated schools. Under these circumstances, when the resulting district lines drawn reflect a discriminatory pattern, De jure segregation is established.
 
 
 21
 410 F.2d at 924.
 
 
 22
 The district lines in Conway County similarly reflect a discriminatory pattern. Furthermore, there has been no effort on the part of the public officials responsible to correct the segregation. Present day evidence of continuing racial segregation in Conway County is manifest in the racial composition of the faculty of the various school districts. Nemo Vista and Wonderview had no black faculty members at the time the complaint was filed. Plumerville had only two black faculty members, whereas East Side had only one white teacher. Morrilton, by far the largest district, had only five black teachers out of a faculty of 101. For these reasons, we hold that the District Court correctly found unlawful segregation to exist in Conway County.
 
 
 23
 We turn to the question of the propriety of interdistrict relief. The Supreme Court, in Milliken v. Bradley, 418 U.S. 717, 744-745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974) (Milliken I ), held that
 
 
 24
 (t)he controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. Swann (v. Charlotte-Mecklenburg Bd. of Ed.), 402 U.S., (1) at 16, (91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554). Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.
 
 
 25
 The violation here is clearly interdistrict in nature. East Side is almost entirely black and includes territory that would properly have been absorbed by the surrounding districts were it not for racial considerations. The boundaries of the East Side District, and consequently, the boundaries of the other school districts in Conway County, were not neutrally drawn. Thus, the prohibition against interdistrict relief pronounced in other cases, See, e. g., Milliken I, id; Bradley v. School Board of City of Richmond, Va., 462 F.2d 1058 (4th Cir. 1972), Aff'd without opinion by an equally divided court,412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973); Tasby v. Estes, 412 F.Supp. 1185 (N.D.Tex.1975), Aff'd, 572 F.2d 1010 (5th Cir. 1978), Cert. granted sub nom., Estes v. Metropolitan Branches of Dallas NAACP, 440 U.S. 906, 99 S.Ct. 1212, 59 L.Ed.2d 454 (1979), is not applicable here. Interdistrict relief is appropriate and necessary to remedy the constitutional violation. See Haney v. County Board of Education of Sevier County, Ark.,supra; United States v. State of Missouri, 515 F.2d 1365 (8th Cir.), Cert. denied sub nom., Ferguson Reorganized School Dist. v. United States, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975); Newburg Area Council, Inc. v. Board of Education of Jefferson Co., Kentucky, 510 F.2d 1358 (6th Cir. 1974), Cert. denied, 421 U.S. 931, 95 S.Ct. 1658, 46 L.Ed.2d 88 (1975).
 
 
 26
 Morrilton and Plumerville argue that since there was no evidence implicating them in a direct way with the establishment of the East Side District,[5] the court has no authority to order them to remedy the state's wrong. This argument is clearly without merit since the effects of the unconstitutional state action are felt in both districts. As the Court stated in United States v. Board of School Commissioners, 573 F.2d 400, 410 (7th Cir.), Cert. denied sub nom., Bowen v. United States, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978):
 
 
 27
 (S)chool officials may not maintain that their districts should be excluded from any interdistrict remedy if they are found innocent of committing any constitutional violations because they should not be held responsible for the acts of the state legislators or other state subdivisions such as a local housing authority or a zoning board. The commands of the Fourteenth Amendment are directed at the state and cannot be avoided by a fragmentation of responsibility among various agents. Cooper v. Aaron, 358 U.S. 1, 15-17, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). If the state has contributed to the separation of the races, it has the obligation to remedy the constitutional violations. That remedy may include school districts which are its instrumentalities and which were the product of the violation.
 
 
 28
 The final issue is whether the remedy ordered by the District Court is too broad. Morrilton and Plumerville argue that the District Court ordered the most intrusive and complicated desegregation plan offered, and that the nature of the relief exceeds the scope of the constitutional violation.
 
 
 29
 The basic principles applicable in determining the scope of relief have been clearly set forth by the Supreme Court. The goal is the elimination of all vestiges of state-imposed segregation. E. g., Brown I, supra; Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II); Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). A district court has broad equitable powers in ordering the elimination of the vestiges of state-imposed segregation; however, those powers are limited by the principles that (1) the nature of the desegregation remedy is to be determined by the nature and the scope of the constitutional violation, Id. at 16, 91 S.Ct. 1267; Milliken v. Bradley, 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II); (2) the remedy must, to the greatest degree possible, be designed "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct," Milliken I, supra, 418 U.S. at 746, 94 S.Ct. at 3128; and (3) in devising the remedy, federal courts must take into account the interest of state and local authorities in managing their own affairs, consistent with the constitution. Milliken II, supra, 433 U.S. at 280-281, 97 S.Ct. 2749.
 
 
 30
 Here, the nature of the violation was the consolidation of school districts on the basis of race. As a study of the map of the school district boundaries indicates, the effects of that consolidation were manifested primarily in the boundaries and racial composition of the Morrilton, Plumerville and East Side Districts. East Side is almost all black, and Morrilton is disproportionately white. All three districts have highly irregular boundaries. The remedy ordered by the District Court reflected these facts. It provided for the retention of the boundaries of the Wonderview District, slight enlargement of the Nemo Vista District, and consolidation of the Morrilton, Plumerville and East Side Districts.[6] Desegregation of the East Side District could not be accomplished unless either consolidation or a major shift in the boundaries of the Morrilton, Plumerville and East Side Districts occurred. No viable plan utilizing the latter alternative was offered. In light of these facts, we cannot agree with the appellants that the remedy exceeds the scope of the violation. The consolidation order was consistent with our holdings in Haney v. County Board of Education of Sevier County, Ark., supra, and in United States v. State of Missouri, supra.
 
 
 31
 Nor can we agree that the remedy was unduly intrusive. The defendants had known since the District Court's 1973 order that the unconstitutional segregation of the East Side District would have to be remedied. They were unable to agree upon a suitable remedy. Instead, each district offered a plan suited to its own best interests. Extensive expert testimony was offered in support of the various plans submitted by the parties. After hearing the evidence, the District Court chose the government's plan, which was unbiased and which was favored by two of the districts over the plans submitted by the other districts. The government plan also compared favorably to the plans initially offered by the other parties in an analysis undertaken by the Arkansas State Board of Education. The court found that Government Plan B would result in the most complete and equitable integration of the students of Conway County, would be the most likely to prevent future resegregation, would be the most consistent with educational objectives and would result in the possibility of the most efficient use of existing personnel and facilities.
 
 
 32
 We must give deference to the District Court's findings of fact, which can be set aside only if clearly erroneous. Fed.R.Civ.P. 52(a); United States v. State of Missouri, supra, 515 F.2d at 1371. As Mr. Justice Stewart pointed out in his concurring opinion in Columbus Board of Education v. Penick, --- U.S. ----, ----, 99 S.Ct. 2982, 2983, 61 L.Ed.2d 666 (1979),
 
 
 33
 (t)he development of the law concerning school segregation has not reduced the need for sound factfinding by the district courts, nor lessened the appropriateness of deference to their findings of fact. To the contrary, the elimination of the more conspicuous forms of governmentally ordained racial segregation over the last 25 years counsels undiminished deference to the factual adjudications of the federal trial judges in cases such as these, uniquely situated as those judges are to appraise the societal forces at work in the communities where they sit.
 
 
 34
 Morrilton and Plumerville have not convinced us that the District Court's findings are clearly erroneous. They argue that the remedy is defective because of all the proposed remedies, it results in the greatest loss of local autonomy. It is true that "local autonomy of school districts is a vital national tradition." Dayton Board of Education v. Brinkman, 433 U.S. 406, 410, 97 S.Ct. 2766, 2770, 53 L.Ed.2d 810 (1977); Milliken, I, supra, 418 U.S. at 741-742, 94 S.Ct. 3112. However, as the Court stated in Milliken I, id. at 744, 94 S.Ct. at 3127,
 
 
 35
 (s)chool district lines and the present laws with respect to local control, are not sacrosanct and if they conflict with the Fourteenth Amendment federal courts have a duty to prescribe appropriate remedies.
 
 
 36
 The consolidation of Morrilton, Plumerville and East Side was necessary to cure the constitutional violations. Loss of local autonomy is insufficient justification standing alone to overturn the remedy ordered by the District Court.
 
 
 37
 Morrilton and Plumerville also attack certain details of the remedy ordered by the District Court. They argue, initially, that the court's order imposes a requirement on all five of the districts to establish and maintain a racial balance in each school and grade of not less than thirteen percent nor more than thirty-three percent black. Morrilton and Plumerville argue that this order is in conflict with the teachings of Swann v. Charlotte-Mecklenburg Board of Education, supra, and Milliken I, supra, that racial balance is not constitutionally required and that transitional requirements imposed are not to be continued in perpetuity.
 
 The District Court ordered that
 
 38
 (i)n creating attendance zones, or if assignment policies are used other than zones, you must keep the percentage of blacks in each school and each grade at not less than 13 percent or greater than 33%. This requirement, I should point out to the people at Wonderview and Nemo Vista, is required in their districts also.
 
 
 39
 We do not construe this order of the District Court as requiring, as a matter of constitutional right, a particular racial balance. Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 24, 91 S.Ct. 1267. The court acted within its discretion in ordering the districts to assure a certain racial composition, with variation permitted among schools and grades. Likewise, we do not read the District Court's order as requiring the districts to permanently maintain a certain racial balance. The court's order was primarily concerned with integrating the districts and prohibiting discriminatory acts in the future. It did not require that the racial balance it set forth be maintained in perpetuity.
 
 
 40
 Finally, Morrilton and Plumerville argue that compliance with the District Court's order that implementation of the plan be accomplished by the beginning of the school year commencing in August, 1979, is impossible. This appeal was not argued until June 12, 1979, less than three months before the beginning of the 1979 school year. The Court recognizes that much of the delay involved in the disposition of this case was not the responsibility of the school districts,[7] and finds that a two-step implementation of the District Court's order will result in the more orderly and effective integration of the school districts. Therefore, the Court affirms the District Court's order requiring integration of the Morrilton, Plumerville and East Side Districts but modifies the order to provide that
 
 
 41
 (a) The integration of the high schools within the newly consolidated district shall be accomplished so as to be effective at the beginning of the school year commencing in August, 1979;
 
 
 42
 (b) The integration of the elementary and junior high schools shall be accomplished so as to be effective at the beginning of the school year commencing in August, 1980; and
 
 
 43
 (c) The school board shall consist of the members designated by Judge Eisele through the school year or until such time as the schools have been fully integrated in accordance with the order of the District Court and of this Court. The election for school board members in the new consolidated district shall be held at the first date upon which school board elections are regularly scheduled in the State of Arkansas after the integration is complete. The board shall be elected and constituted in accordance with constitutional standards and on the basis of a plan submitted by the district to the District Court for its approval.
 
 
 44
 Affirmed in part and reversed in part. Costs will be taxed to the appellants.
 
 
 
 [1]
 Conway County No. 1, Wonderview No. 2, East Side No. 5, Nemo Vista No. 8, Morrilton No. 32 and Plumerville No. 39
 
 
 [2]
 The court ordered that one of the two schools in that district be closed and one transferred to the Wonderview District. Students residing in the Hickory Hill portion of the County District, which was bounded on three sides by the Morrilton District, were ordered transferred to Morrilton. The Conway County District has not operated public schools since 1973, and its disestablishment has not been appealed
 
 
 [3]
 Initiated Act No. 1 of 1948 (Ark.Stat.Ann. §§ 80-426 to -429 (Repl.1960)); 1931 Ark.Acts, Act 169; 1927 Ark.Acts, Act 152
 
 
 [4]
 Morrilton and Plumerville operated dual school systems in compliance with this statute; the other school districts transferred their black students to black schools in other districts. Some years after Brown I, Morrilton and Plumerville ceased operating dual school systems and interdistrict transfers ceased
 
 
 [5]
 The government stipulated that neither Morrilton School District, nor its Board of Directors, nor its administration, participated in the formation or establishment of East Side subsequent to 1939 within the period of time subject to discovery. The government also stipulated that there was no transfer or exchange of territorial jurisdiction between Morrilton School District and the East Side School District. The evidence does show that the Plumerville District regularly sent its black students to the East Side high school, that both Morrilton and Plumerville operated dual school systems until the 1960's and that faculty segregation persisted at least through trial
 
 
 [6]
 Most of the plans submitted by parties called for some type of consolidation. The controversy generally was whether the consolidation should be fairly broad in scope, as the government suggested, or whether, at most, only East Side and Plumerville should be consolidated
 
 
 [7]
 The case was originally assigned to the Honorable J. Smith Henley. Upon his appointment to this Court, it was assigned to the Honorable Terry Shell, who died before taking any action on the case. The case was then assigned to the Honorable Garnett Thomas Eisele, who heard it as promptly as an impossible caseload would permit