Dorothy HOOTS, individually and as mother of her children Janelle Hoots and Jamie Hoots, Mrs. Addrallace Knight, individually and as mother and natural guardian of her children Ronald Knight, Loretta Knight, Terrance Knight, Marc Knight and Byron Knight; Barbara Smith, individually and as mother and natural guardian of her children Tawanda Smith, Tevela Smith, Joseph Smith, Wesley Smith and Eric Smith; on behalf of themselves and all others similarly situated

v.

COMMONWEALTH OF PENNSYLVANIA: Edward X. Hallenberg, President of the Allegheny County Board of School Directors; the Allegheny County Board of School Directors; W. Deming Lewis, Chairman of the Pennsylvania State Board of Education; Michael Sullivan, President of the School District of the Borough of Braddock; the School District of the Borough of Braddock; Andrew Lisyak, President of the School Board of the School District of the Borough of Rankin; the School District of the Borough of Rankin, Leo Campbell, President of the School Board of the School District of the Borough of North Braddock; and the School District of the Borough of North Braddock; the Allegheny Intermediate Unit Board of School Directors and Edward X. Hallenberg, as President of the Allegheny Intermediate Board of School Directors,

Turtle Creek Area School District, Edgewood School District, West Mifflin School District, Steel Valley School District, East Allegheny School District, Swissvale Area School District, Churchill Area School District, and Gateway School District.

Civ. A. No. 71–538.

United States District Court, W. D. Pennsylvania.

March 5, 1981.

Thomas J. Henderson, Neighborhood Legal Services Assoc., Pittsburgh, Pa., James S. Liebman, New York City, for plaintiff.

Allen C. Warshaw, Deputy Atty. Gen., Chief, Civ. Litigation, Com. of Pa., Dept. of Justice, Harrisburg, Pa., for Com. of Pa.

J. Robert Maxwell, Pittsburgh, Pa., for Churchill.

John J. Hickton and Alan Opsitnick, Pittsburgh, Pa., for Swissvale.

Thomas M. Rutter, Pittsburgh, Pa., for Gateway and West Mifflin.

G. N. Evashavik, Pittsburgh, Pa., for Turtle Creek.

Anton Bigman, Pittsburgh, Pa., for General Braddock.

Donald C. Fetzko, West Mifflin, Pa., for Steel Valley.

Carl W. Brueck, Pittsburgh, Pa., for Edgewood.

William M. Wycoff and J. Frank McKenna, III, Pittsburgh, Pa., for East Allegheny.

## OPINION

WEBER, Chief Judge.

In 1973, this court found the General Braddock Area School District was a racially segregated district, created by the Commonwealth of Pennsylvania through its state and county Boards. Since that time, the court has heard testimony on several plans designed to desegregate the school system. At this stage, however, no further decisions on an appropriate plan can be made until it is determined which, if any, of the surrounding school districts can be included in any remedy within the guidelines of *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). (*Milliken I*).

This was a matter set down for briefing and argument in August 1980 at the time of extensive hearings on this case. Our consideration and determination of this matter was interrupted and delayed by the abrupt change of position of plaintiffs' counsel, the interlocutory appeal which followed, and the five months' wait until the decision of the Court of Appeals, 3rd Cir., 639 F.2d 972, on this matter. Now that it is back with this court time was required to refresh recollection and review files before determining what might have been determined in September 1980. The court has relied on the arguments made at that time and the extensive briefs filed at various points to arrive at the following conclusions.

*Milliken* held that a multi-district remedy was impermissible where the court has found a condition of segregation in only one district, unless it can be shown that the violation was caused by the acts of adjacent school districts.

The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. *Swann*, [*v. Charlotte-Mecklenburg Bd. of Ed.*] 402 U.S., [1] at 16 [91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554]. Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.

*Milliken v. Bradley, supra* at p. 744–45, 94 S.Ct. at 3126–27.

Before any proposed remedy can be fully considered we must review the facts of this case to determine whether an interdistrict remedy is appropriate here or whether any remedy imposed must be limited in its application to less than all of the districts joined herein. It begins to appear that there is no possible remedy that would effectively desegregate General Braddock that does not include many neighboring school districts. Because an interdistrict remedy may be the only remedy available to the court, we must review the facts of this case to determine whether such a remedy is appropriate here.

Furthermore, from the testimony produced at the hearings on the tuition plan it becomes more evident that an interdistrict remedy that does not include a broad area

would be a futile judicial exercise because limiting the remedy to only some of the districts, or the adjacent districts, would enlarge the size of the segregated district because the school population in some nearby districts approaches the degree of minority concentration existing in General Braddock Area School District. The focus of the infection would metastasize; a super General Braddock Area School District would be created with the same problem. The same consideration required that we reject Plan 22-W because the inclusion of Wilkinsburg completely upset the racial balance sought.

The General Braddock Area School District was created as a result of a reorganization of school districts initiated by the Commonwealth and accomplished by three specific pieces of legislation.

Prior to 1961, the Pennsylvania Public School Code of 1949, 24 P.S. § 2–251 allowed school districts to merge voluntarily. Thereafter there was a series of statutes compelling mergers. The Commonwealth first passed the Act of September 12, 1961, P.L. 1283, No. 561, 24 P.S. § 2–281 et seq. [Act 561] to effectuate the state's goal of achieving comprehensive programs of education through larger school districts. Although the Act recognized voluntary merger of districts this was the first Act to set up a compulsory system of reorganization and merger and provided that each county board of school directors should prepare a plan of organization of administrative units for the county for review by the State Council of Education by Jan. 1, 1963. 24 P.S. §§ 2–282, 2–283. *State Board of Education v. Franklin Township School District*, 209 Pa.Super. 410, 228 A.2d 221, 223 (1967). Once submitted by the county board, the State Board would review the plan for approval taking into consideration certain environmental criteria, including topography, pupil population, socio-economic characteristics, facility of transportation of pupils, utilization of existing school buildings, existing administrative units, and potential population changes. 24 P.S. § 2–281. After review, the State Board could reject or rewrite those plans that it did not consider "wise in the best interests of the educational system of the Commonwealth". It was further provided specifically that the State Board could not approve any plan for an administrative unit which contained a student population of less than 4,000 pupils unless the above criteria were considered and the Board found that the situation necessitated the lower student population. In no event, however, was the State Board to approve any administrative unit with less than 2,500 pupils. 24 P.S. § 2–283. Once approved, the administrative units were to become operative in 1965.

At the time Act 561 was passed, the following school districts operated in central eastern Allegheny County: Wilmerding, North Versailles, Gateway, Turtle Creek, East Pittsburgh, Braddock, North Braddock, Rankin, Braddock Hills, Swissvale, Edgewood, Wilkens, and Forest Hills.[1] On May 15, 1962, before the County Board had established a plan for reorganization, Wilkens and Forest Hills areas voted to voluntarily merge into a single district known as Churchill. Churchill was later approved by the State Board on June 25, 1962. Allegheny County did submit a reorganization plan under Act 561 which was approved by the State Board, but before the effective date of 1965.

Act 299 (Act of August 8, 1963, P.L. 564, No. 299, 24 P.S. § 2–290 et seq.) was passed to replace Act 561. Act 299 contained the same basic provisions as Act 561, but included a three-tiered appeals process for "aggrieved" school districts. The criteria for reorganization and the minimum 4,000 pupil population provision were both carried over. Act 299, however, expressly reserved to the State and County Boards the right to reconsider its approval of previously joined districts (ones formed by voluntary merger prior to Act 299) and to be remerged into

1. Several of these districts did not maintain their own high schools but utilized a tuition plan with neighboring districts.

even different and larger districts. 24 P.S. § 2–292. Therefore, any administrative units that had been approved under Act 561 would still come under the authority of Act 299 and the County was effectively operating from a clean slate.

Although aware of strenuous objections to the proposed plan submitted by the County Board, at its meeting on September 6, 1964, the State Board approved the following administrative units: Unit 14 (Gateway); Unit 15 (Wilkens and Forest Hills combining to form Churchill); Unit 18 (Wilmerding and North Versailles combining to form East Allegheny) and Unit 38 (Braddock Hills, Edgewood, and Swissvale). As a result, Units 14, 15 and 18 all became operative on July 1, 1966. Unit 38 did not because Edgewood took an appeal.

Along with Unit 38, this left unapproved the racially unbalanced and controversial proposed Unit 16, which consisted of Braddock, North Braddock, Rankin, Turtle Creek, and East Pittsburgh. Since the surrounding municipalities with approved school districts were now operative, they were no longer available under any reorganization plans. This left the State few options with which to deal with Unit 16. The state chose to create new Unit 16, consisting of Braddock, North Braddock and Rankin (with a close to 40% black student population as of 1967), and new Unit 42, consisting of Turtle Creek and East Pittsburgh (with a 1.3% black student population as of 1967).

In 1968, the legislature passed Act 150 (Act of July 8, 1968, P.L. 299. No. 150, 24 P.S. § 2400.1 et seq.) which superseded Act 299. This Act was simply a continuation of Act 299 and contained the same basic provisions as Act 299, except for modified appeals procedure. Act 150 further provided that all districts that had been merged under Act 299 would not be forced to merge to form larger districts. Therefore, with nothing new to work with, the State approved Unit 16, now called General Braddock Area School District, and Unit 42, now known as Turtle Creek, as they had been proposed under Act 299. The only change of the

County Board's plan that occurred under Act 150 was that the proposed Unit 38 (Edgewood, Braddock Hills and Swissvale) was split up into two smaller districts: Edgewood, with a student population of 928, 0% black, and Swissvale and Braddock Hills, now known as Swissvale, with a student population of 2,286, 10% black. This was done in spite of the statutory criteria for the size of districts.

These school districts went into effect on July 1, 1971 and this lawsuit was filed on June 9, 1971.

In an earlier opinion in this case, *Hoots v. Commonwealth of Pennsylvania*, 359 F.Supp. 807 (1973), this court made the following conclusion of law.

7. The natural, foreseeable and actual effect of combining Braddock, North Braddock and Rankin into a single school district was to perpetuate, exacerbate and maximize segregation of school pupils. Such conduct constituted an act of *de jure* discrimination in violation of the Fourteenth Amendment. (citations omitted).

359 F.Supp. 807, at 823.

This constitutional violation was accomplished by the State and County Board through the reorganization process completed through Acts 561, 299, and 150. This court found specifically that the County and State Boards maximized racial segregation in the public schools by creating a school district composed of Braddock, North Braddock and Rankin. At the time the state approved such a district, no other combination of school districts in the area would have created a district with as large a percentage of non-white enrollment. (Finding of Fact No. 51, *Hoots, supra* at 819). Furthermore, the plan of organization adopted by the County and State Boards pursuant to Act 150 failed to meet many of the essential requirements of that Act and recognized educational standards. Act 150 was not met in several ways, the most obvious of which is the disregard of the 4,000 pupil population requirement (unless a smaller district was required) by combining Turtle Creek and East Pittsburgh

with a population of only 1,898, by combining Braddock Hills and Swissvale with an enrollment of only 1,925, and by permitting Edgewood to stand alone with an enrollment of only 928. (Findings of Fact, No. 52. *Hoots, supra,* at 819).

The court found that the State and County Boards knew or should have known that they were creating a racially segregated school district. (Finding of Fact No. 50, *Hoots, supra,* at 818.) This court also found that the school districts in the vicinity of Braddock and Rankin continually sought to avoid being included in a school district with them due to the high concentration of blacks. (Finding of Fact No. 39, *Hoots, supra,* at 816.) At the time that General Braddock Area School District was approved by the State Board, alternatives to a school district composed of Braddock, North Braddock and Rankin were available that would have been more consistent with Act 150. In view of the availability of these alternatives, the decision of the County and State Boards to create General Braddock Area School District was contrary to Act 150 and the standards set forth therein. (Findings of Fact 53 and 54, *Hoots, supra,* at 820).

On the basis of all the facts, this court concluded that by combining Braddock, North Braddock and Rankin into one school district, the County and State Boards created a racially segregated school district. (Finding of Fact No. 58, *Hoots, supra,* at 820). Furthermore, this court found that "the County and State Boards devised this plan of organization of administrative units which comprised Braddock, North Braddock and Rankin into one school district to satisfy the desires of as many of the surrounding municipalities as possible to be placed in a school district which did not include Braddock and Rankin." (Finding of Fact No. 59, *Hoots, supra,* at 821.) Finally, the record contained no evidence showing that the school district boundaries established in the plan of organization of administrative units are rationally related to any legitimate purpose and the court found that those boundaries did not promote any valid state interest. (Finding of Fact No. 61, *Hoots, supra,* at 821.)

On the basis of the above history of the reorganization of school district boundaries in the central eastern portion of Allegheny County pursuant to Acts 561, 299 and 150 and on the Findings of Fact of this court, particularly those laid out above, the court holds that a multi-district remedy is appropriate and permissible in this case. General Braddock Area School District was created as a result of an interdistrict violation conducted by the state during the reorganization process which included the redrawing of school district boundaries in that part of Allegheny County. *Milliken I* holds that "an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation." This case clearly falls within *Milliken I* guidelines for an interdistrict remedy, since racially discriminating acts of the state have been a substantial cause of interdistrict segregation.

The neighboring school districts that argue against an interdistrict remedy base their arguments on the ground that this court has made no finding that they had any involvement in the reorganization process which would enable the court to apply any remedy to them. They claim that since they are not guilty of any specific discriminatory actions they cannot be implicated in a multidistrict remedy.

A multidistrict remedy can be applied to surrounding districts that have not been found to have committed a constitutional violation themselves where their boundaries were drawn or redrawn during the course of the same violation which created the segregated school districts. *Morrilton School District No. 32 v. United States,* 606 F.2d 222 (8th Cir. 1979), *cert. denied* 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); *Evans v. Buchanan,* 416 F.Supp. 328 (D.Del.1976), *aff'd* 555 F.2d 373 (3d Cir. 1977; *United States v. Board of School Commissioners of the City of Indianapolis,* 541 F.2d 1211 (7th Cir. 1976).

In the *Morrilton* case, the court found that the school district lines in Conway

County followed a discriminatory pattern and ordered an interdistrict remedy. Some of the surrounding districts that would be effected by the remedy argued that since there was no evidence implicating them in a direct way, the court had no authority to order them to remedy the state's wrong. The court found this argument to be without merit since the effects of the unconstitutional state action are felt in both districts. The court went on to quote *United States v. Board of School Commissioners of City of Indianapolis*, 573 F.2d 400, 410 (7th Cir. 1978), *cert. denied* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978):

> [S]chool officials may not maintain that their districts should be excluded from any interdistrict remedy if they are found innocent of committing any constitutional violations because they should not be held responsible for the acts of the state legislators or other state subdivisions such as a local housing authority or a zoning board. The commands of the Fourteenth Amendment are directed at the state and cannot be avoided by a fragmentation of responsibility among various agents. *Cooper v. Aaron*, 358 U.S. 1, 15–17, 78 S.Ct. 1401, [1408–09] 3 L.Ed.2d 5 (1958). If the state has contributed to the separation of the races, it has the obligation to remedy the constitutional violations. That remedy may include school districts which are its instrumentalities and which were the product of the violation. 606 F.2d at 228–229.

The several opinions written in the Wilmington case, *Evans v. Buchanan, supra,* also support an interdistrict remedy in a case whose facts are similar to our own. The State of Delaware had set out a plan for reorganization and consolidation, which excluded the school district of Wilmington by a provision which limited the maximum pupil enrollment to 12,000. Since Wilmington already had an enrollment of over 15,000, they were not considered for consolidation with any of the surrounding school districts. Since their non-white population was already at 66%, this had the effect of perpetuating and continuing segregation in the Wilmington schools.

The court in *Evans* found that the state had violated the constitution by acting in a manner which was a substantial and proximate cause of the existing disparity in racial enrollments in the districts of that area. They ordered a multidistrict remedy and the surrounding districts complained that they had committed no constitutional violation and should not be included in such a remedy. The court found this defense to be inadequate where the local boards are creatures of the state that had committed the violation.

> The fact that birth rates, or population shifts, or other factors also contributed to a degree will not relieve the State from its obligation to desegregate. The remedy for the violation must include school districts which are its instrumentalities and which were the product of one of the violations. The remedy for the acts of the State may be inconvenient, burdensome, and expensive to some of those instrumentalities, but neither inconvenience, burden nor expense can negate the duty of the Court to order effective relief when a not insubstantial violation has been shown.

*Evans*, supra, at 339–340.

The case presently before this court, as in the cases cited above, calls for an interdistrict remedy. The State and County Boards violated the constitution in the manner in which the school district lines were drawn and so all surrounding districts can be implicated in a remedy, despite their alleged lack of involvement in the process.

> Where the State has contributed to the separation of races by redrawing school lines, necessarily the districts on both sides of the lines are part of the violation itself, and exclusion of the suburban districts cannot be predicated on their own purported innocence when their present lines were drawn or redrawn in the course of a violation.

*Evans*, supra, at 340.

Neither are the surrounding districts innocent in the reorganization plan which created General Braddock. This court found

that the school districts in the vicinity of Braddock and Rankin continually sought to avoid being included in a school district with them due to the high concentration of blacks. *Hoots*, supra. Finding of Fact No. 39.

Some of the school districts also claim a particular exclusive status, allegedly given them by the state, which would exclude them from being a part of any multidistrict remedy. Churchill, and East Allegheny were approved as school districts under Act 299. When that Act was superceded by Act 150, districts approved under Act 299 were exempted from Act 150. Churchill and East Allegheny claim they were granted "grandfather status" and therefore were not implicated in the creation of General Braddock which occurred under Act 150. Edgewood claims that because its boundaries preexisted all mergers, they were never involved in any redistricting which led to the creation of any segregated district.

This argument is without merit since the constitutional violation was not only committed under Act 150, but pursuant to the entire reorganization process that began with Act 561. Furthermore, the very elimination from consideration for merger with those districts was itself a contributing factor to the creation of a segregated school district since all the districts with a lower black student population were now excluded from any plan, leaving General Braddock Area School District in an isolated position.

Churchill argues exclusion from a remedy even further in that they had begun their voluntary merger plans back in the 1950's, before Act 561 and the state reorganization plan. It is irrelevant, however, when their current boundaries were first established. The actual vote to merge did not occur until after the passage of Act 561. The state at all times under Act 561 and Act 299 had expressly retained the power to force further merger with districts that had previously voluntarily merged. The fact that the state chose not to disrupt the new district of Churchill does not mean that the State could not have ordered them to merge again with Braddock Hills. Furthermore, it

was the refusal to force such a merger, which was within the state's power, which contributed to the isolation of General Braddock.

Finally, the alleged "grandfather status" granted by Act 150 cannot eliminate any of the school districts from a future remedial plan of this court or the State. School districts are the creation and instrumentalities of the state and have no vested rights in their boundaries. In a case challenging the ability of the state to require merger under Act 299, the Pennsylvania Supreme Court held that the legislature reserves its powers to alter school laws in all contracts made by school districts. The court found that Act 299 could alter any mergers completed under prior acts since the Public School Code of 1949 did not intend to create vested rights but merely authorized the formation of school districts which would exist until changed by future legislative direction.

The continued ability to alter the organization of the school system throughout the Commonwealth is a prerequisite to the fulfillment of the Legislature's constitutional duty to provide for the maintenance of a thorough and efficient system of public schools.

\*     \*     \*     \*     \*     \*

The jointure agreement involved here was made pursuant to the authority given to school districts to enter into such agreements with the concomitant condition inherent in such legislative authority that actions taken pursuant thereto are subject to later change by the Legislature. As was pointed out in *Dodge v. Bd. of Education*, 302 U.S. 74, 79, 58 S.Ct. 98, 100 [82 L.Ed. 57] (1937), 'the presumption is that such a law is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the Legislature shall ordain otherwise.'
*Chartiers Valley Joint Schools v. Allegheny County Board*, 418 Pa. 520, 528–29, 211 A.2d 487 (1965).

School districts have no vested rights in their boundaries and they can be altered by

622

the state whenever necessary. When the state has committed a constitutional violation in the use of its power, school district lines can be redrawn by the court to remedy that violation.

Edgewood also claims a sort of special status exempting it from any remedial plan since the Pennsylvania Supreme Court upheld its right to stand alone as a school district, despite its obvious non-compliance with the student population requirements. *Edgewood Borough School District Appeal,* 445 Pa. 343, 285 A.2d 880 (1971). That case, however, did not specifically address the propriety of or the motivation for letting Edgewood stand alone. It did not address the segregative effect of that action at all. That case was decided on a finding that the state had not abused its discretion in approving such a school district. The court refused to interfere with administrative decisions.

This court, however, must interfere with administrative decisions which are made by the state during the course of a constitutional violation.

On the basis of the foregoing this court holds that the following school districts may be included in any remedial plan to be considered by this court: Churchill, Turtle Creek, Swissvale, East Allegheny, Edgewood, and Gateway.

Two other school districts have been added as parties to consider the nature of the remedy, West Mifflin and Steel Valley. Both these school districts are located across the Monongahela River from the others in this area of eastern central Allegheny County. They were never considered in prior merger plans. The evidence shows that there is only one bridge carrying heavy traffic connecting these two school districts with the General Braddock area. This factor would make any consolidation with West Mifflin or Steel Valley highly impractical and they are, therefore, not to be included in any remedial plan before this court. Furthermore, the evidence suggests that as to Steel Valley, the present high degree of black school attendance in that district would only spread the area of segre-

gation, and in West Mifflin the black school population in the most adjacent school facilities shows the same pattern. Furthermore, neither Steel Valley nor West Mifflin were involved in the jointure, consolidation or merger of the school districts which eventually led to the creation of the General Braddock Area School District.

ORDER

AND NOW, this 5th day of March, 1981, IT IS ORDERED THAT further consideration of remedial plans shall be governed by the above Opinion, and the motions to dismiss of the school districts of Churchill, Turtle Creek, Edgewood, East Allegheny and Gateway are DENIED. The motions to dismiss of the school districts of Steel Valley and West Mifflin are GRANTED.