**Dorothy HOOTS, individually and as mother of her children, Janelle Hoots and Jamie Hoots, et al.**

v.

**COMMONWEALTH OF PENNSYLVA-NIA, et al.**

Civ. A. No. 71–538.

United States District Court, W. D. Pennsylvania.

April 28, 1981.

See also D.C., 510 F.Supp. 615.

Thomas J. Henderson, Neighborhood Legal Services Ass'n, Pittsburgh, Pa., for plaintiff.

Allen C. Warshaw, Deputy Atty. Gen., Harrisburg, Pa., Alton P. Arnold, Pittsburgh, Pa., for defendant Com. of Pa.

J. Robert Maxwell, Pittsburgh, Pa., for Churchill Borough.

John J. Hickton, Pittsburgh, Pa., for Swissvale.

G. N. Evashavik, Pittsburgh, Pa., for Swissvale.

Anton Bigman, Pittsburgh, Pa., for General Braddock.

John W. Brueck, Pittsburgh, Pa., for Edgewood.

James S. Liebman, New York City, for plaintiff.

## OPINION

WEBER, Chief Judge.

We begin bearing in mind a profound observation of Henry Louis Mencken that every difficult problem always has a simple solution and that solution is always wrong. There is no simple solution here and we have searched all of those offered. Any solution is involved with high emotional reactions to the extent that calm discussion is rarely possible in the presence of as many as twelve sets of counsel, mostly representing diverse and possibly irreconcilable interests.

The history of this case has been recited too often in the opinions of this court and reviewing courts to justify any repetition here. It has not always been discussed accurately. The description of the plaintiffs as parents of children in the General Braddock Area School District, of the plight of the Hoots, Knight and Smith children was pure fancy. Mrs. Hoots has not been a resident of this District since before the very first hearings; nine of Mrs. Knight's children graduated from Braddock High School before the reorganization, and Mrs. Knight has not resided in the district since 1977. Mrs. Smith has remained a resident of General Braddock Area School District and an employee of plaintiffs' counsel, but her children are enrolled in parochial schools. Because of these facts, plaintiffs have moved for the substitution of new parties plaintiff, although the caption still bears the Hoots name for identifying purposes.

Nor is the picture of the black children of General Braddock sitting on the steps of the courthouse waiting for justice accurate. It would be more accurate to state that they are part of a group, both black and white, that are picketing the court to stop any plan that involves the closing of Scott High School. They have so testified, they have filed petitions with the court, and have indulged in a letter writing campaign. This feeling was particularly strong when Scott High School became the State Champion in the basketball competition.

Nevertheless, there is a clear violation of constitutional rights, and there are now proper parties plaintiff before the court; regardless of the size of the group they have a right to be remedied.

Following our rejection of Plan A in 1977 for the reasons set forth in the opinion and the appeal therefrom, this court proceeded on the motion of the plaintiffs to order the Commonwealth to prepare a tuition voucher plan. Additional neighboring school districts were added as defendants for the purpose of devising a remedy. The Commonwealth required more time than was originally allowed, and finally filed its detailed tuition plan on May 15, 1980. The school districts involved filed objections by June 16, 1980, and hearings began on July 14, 1980 and continued until July 30, 1980. In the midst of the hearings, which the court had limited solely to the merits of the tuition plan, plaintiffs took an abrupt change of position and opposed the plan, and presented testimony in opposition. In the midst of the hearings plaintiffs presented a motion calling for the immediate rejection of the tuition plan and for an injunctive order requiring the Commonwealth to prepare a merger or consolidation plan. This was denied because the court had not yet made any decision on the requested tuition plan and an immediate appeal by plaintiffs followed.

In the meantime, two additional plans were submitted by parties, an upgrade plan by General Braddock, and a metropolitan merger plan by the Commonwealth, both of which were solely preliminary proposals without a detailed workup. The Commonwealth later withdrew its metropolitan plan from consideration. No plan that we had considered up to that time achieved a consensus of approval by the parties; the tuition plan was the least strenuously opposed because it left the individual administrative units intact, including General Braddock itself, and because it proposed distributing the General Braddock students over a very wide area and among many districts. Nevertheless, it consigned General Braddock students to a second class status, that of tolerated guests in a foreign school district, and it deprived their parents of a voice in the control of the school district that was educating their children.

In August 1980 we were prepared to continue hearings on other plans but all of this was interrupted by the pendency of the appeal.

Upon the return of the mandate on January 27, 1981, we immediately convened the counsel for consideration of further action. We rejected the upgrade plan which did essentially nothing to achieve desegregation and also we determined the *Milliken v. Bradley* issue as it applied to certain of the school districts joined as defendants for the purpose of relief. We dismissed two of the previously joined school districts because their further involvement was considered unnecessary. We determined that the only appropriate remedy in this situation must be a multi-district merger of several school districts into a single district. The plaintiffs' counsel informed us through certain motions for discovery, that they had engaged professional expert services and would submit a plan. On March 24, 1981, the plaintiffs for the first time proposed their own remedy. This called for a plan of consolidation of five school districts. We set the matter down for hearings on April 20, 1981.

We strictly limited this hearing to the question of the geographical boundaries of the proposed district and the identity of the districts to be included. At this point seven school districts remained as defendants for the purpose of constructing a remedy. We limited the plaintiffs to one day of testimony limited solely to this issue, and gave all defendants two days for cross-examination and presentation of direct testimony. The defendants were allowed to divide their time among themselves but did not choose to do so. Only four districts desired to present any direct testimony and for the most part only these districts undertook cross-examination.

General Braddock Area School District announced at the opening of the hearing that they joined with the plaintiffs' motion to approve the five district plan.

We barred all testimony as to the administration of the plan, its implementation, pupil assignments, the further use or discontinuance of school facilities, both be-

cause we believed that the essential primary question for our consideration was the make-up of the new district, and also because we believe that the organization and planning of the educational system in the New School District was a matter for determination by the Pennsylvania Department of Public Instruction, the Allegheny County Intermediate Unit, and the representations of the New School District.

We therefore proceed to our determination of the New School District.

## THE COMPOSITION OF THE NEW DISTRICT.

■ The Court finds that a New School District composed of the present school districts of Churchill, Edgewood, Swissvale, General Braddock, and Turtle Creek would achieve desegregation of the General Braddock Area School District and would achieve the highest beneficial results over and above the results of any other plan submitted to this Court by any party during the whole period of this litigation. The Court bases this conclusion on the following evidence developed in the record:

(1) It would produce a district with a school population 83% white and 17% minority (mostly black), within a general range of recognized desegregation guidelines and comparable to the population distribution over a wide area of Allegheny County.

(2) The pattern of desegregation established is likely to remain stable.

(3) All of the districts included are contiguous to each other, three of the districts border General Braddock, and the remaining district, Edgewood, borders one and almost borders another.

(4) The area of the New District is moderate in size (13.5 sq. miles) as compared to the average size of Allegheny County Districts (15 sq. miles).

(5) The district is roughly circular in configuration, lending itself to increased administrative and transportation efficiencies.

(6) All points in the district are within 2.5 miles radius of its center, and the greatest diameter from one edge of the district to the other is less than 5 miles.

(7) Student population density of the New District would be 821 per square mile, a high density compared to the 275 per square mile density of the average Allegheny County School District (excluding the City of Pittsburgh).

(8) Student population of the New District would be 9,132 in 1981, which exceeds the minimum of 4,000 students mandated for merged districts under the statutory and regulatory guidelines of the Commonwealth of Pennsylvania.

(9) Student enrollment in all of the merged districts has been declining at a rate exceeding 35% in the past ten years, and from the student population figures in grades from kindergarten to 12th grade may be expected to decline at a comparable rate in the next eight years, all of which indicates a need for consolidation to achieve educational efficiency and economy.

(10) All of the merged districts have excess capacity, in most cases substantial, at all instructional levels, making the excess capacity for the New District 40%. This will increase as the student population continues to decline. This excess capacity could be greatly reduced by the merging of these districts, the merging of student population, the discontinuance of old buildings requiring extensive repairs, allowing for a better organized comprehensive educational program without additional cost, and the possibility of very substantial savings in costs, as well as achieving desegregation.

(11) The New District will be strongly interconnected by available transportation arteries, and the relatively short distances between most parts of the district will minimize the time and mileage involved in any additional transportation needed.

12. The existing transportation facilities of the merged districts, should be adequate to serve the transportation needs of the New District.

13. Inasmuch as a substantial number of public school students in the present district are bussed, and because of the limited distances in the New District, it is not contemplated that any large increase in the total

mileage or number of students transported will result from the consolidation.

14. The proposed New District will be financially viable, having a higher tax base per student than the state average, and higher than some of the present districts included.

DISTRICTS EXCLUDED.

We have previously dismissed from consideration of inclusion in the remedial district the districts of Steel Valley and West Mifflin because the distances involved are too great and the transportation bottleneck of a single highway bridge across the Monongahela River is too severe. Furthermore, because Steel Valley's student population shows a high ratio of minority students, its inclusion would not advance the desegregation of General Braddock. The size and distances of the West Mifflin District, the distant location of some of its facilities, and the high percentage of minority student population in the schools nearest the New District do not make it amenable in a district designed to achieve desegregation of the General Braddock district.

At the time of the April 1981 hearings, Gateway district and East Allegheny district remained as parties. They were not included in the Motion of Plaintiffs to create a five (5) district consolidation but their motions for dismissal were opposed. At the hearing, testimony was offered as to the reasons for their exclusion and no evidence supporting reasons for their inclusion was presented. In general, neither of these districts should be included. Their large geographical area, the distances of their facilities from the facilities in the New District, and the acute transportation bottlenecks between these districts and the New District made their inclusion highly undesirable. At the close of the hearings their motions for dismissal were granted.

INDIVIDUAL DISTRICTS TO BE INCLUDED.

This left five districts to be considered. The reasons for the inclusion of each individual district in the New District are:

(1) *General Braddock* : This district must be included in any remedy because its intentional creation as a racially identifiable black school district constituted the constitutional violation found in this case. Its 63% black student population in a larger area where the surrounding districts vary from less than 1% to a maximum of 13% black makes it mandatory for inclusion. It has continued serious financial problems that make its future as a viable district uncertain.

(2) *Turtle Creek* is included because it is contiguous to the General Braddock area, and also contiguous to Churchill which is also included in the New District. It is racially identifiable as a white school district (98%), it is small in area (1.37 miles), and has a high density of pupils per square mile (920), it has significant unused building capacity, particularly in its high school, and has experienced dropping enrollment and faces a continuing decline. Its present 1,200 student population in the face of a state standard of 4,000 students required for an adequate educational program renders its future as a viable independent school district cloudy. It has adequate transportational connection with the rest of the New District. It has close community business and occupation ties with the General Braddock Area District and also with the Churchill Area. It faces the same economic problems as the General Braddock district.

(3) *Churchill* is included because it is contiguous to General Braddock, as well as contiguous to Turtle Creek, Swissvale, and almost if not actually contiguous to Edgewood. It is identifiable as a 99.2% white school district. It has excess capacity in its facilities and a declining enrollment. Its geographical position puts it in the heart of the New District, and its exclusion from the compact formation of the New District would make all of the considerations of geographical contiguity and compactness of the New District meaningless. Its economic strength would add financial stability to the new district.

(4) *Swissvale* is included because it is contiguous to the General Braddock Area District, as well as contiguous to Churchill and Edgewood in the New District, it is small in geographic area but with a high density of pupils per square mile (771), it is small in student population (1,757), below the minimum state standard requiring consolidation, and its student population. It has many connecting arteries of transportation with the rest of the New District. Its exclusion would result in a large vacuum between the other areas of the New District because of its central position in the configuration and its nexus of transportation arteries connecting other parties of the New District.

(5) *Edgewood* is included because it is identifiable as a white school district (98%) in a general area the composition of which is 17% black, and where the adjoining district, Swissvale is 13% black; its very small geographic size, (½ sq. mile), its high student population density (920 pupils per square mile), and its very low student population (731), which has declined and will continue to decline, and its substantial underutilization of facilities. It is close to many other schools in the New District, and has ready transportation access to the other areas included in the consolidation. We recognize that Edgewood was granted an exemption from the 4,000 minimum student population requirement after much litigation, but its student population has continued to decline. It is highly commendable that this district has been able to attract 100 tuition students from Pittsburgh and other districts to help fill the underutilized facilities, and that it is able to receive $1,000 or $1,200 per tuition student in this process, bringing substantial additional revenue to the district. However, it is possible for Edgewood to educate these additional students at a figure much less than the average cost of education per pupil because of the economic law of marginal cost, no increase of operating costs is involved in the utilization of the empty classroom seats. However, in so doing Edgewood has entered the business of private education and using the profit therefrom to help finance the education of its own residents. This is contrary to the Commonwealth's school district reorganization policy. Edgewood's inclusion rounds out the compact shape of the district, and adds financial stability to the New District.

All of these districts are properly subject to inclusion in the remedy of desegregation of the General Braddock Area School District because of their involvement in the violations which led to the creation of the General Braddock Area School District as set forth in our Opinion of March 5, 1981. 510 F.Supp. 615.

## ORDER

AND NOW, this 28th day of April, 1981, it is hereby ORDERED that the public schools in the districts named herein in central eastern Allegheny County, Pennsylvania, shall be desegregated, effective in the beginning of the first semester of the school year, 1981–1982 in accordance with the following terms and conditions:

(1) As of the date of this Order the following school districts in Allegheny County, Pennsylvania, shall cease to exist as separate school districts and shall be consolidated and merged into a single unitary school district, hereinafter referred to as the "New School District";

> Churchill Area School District
> Edgewood School District
> General Braddock Area School District
> Swissvale Area School District
> Turtle Creek Area School District.

(2) The New School District created by this Order shall constitute and be deemed established as a school district and shall belong to the class to which it is entitled as provided by law.

(3) All school directors of the component school districts forming The New School District shall serve out the terms of office for which they were elected. No vacancies occurring in such positions after the date of establishment shall be filled.

(4) On or before the 15th day of May, 1981, such incumbent school directors of the

component school districts shall be called into convention by the County Superintendent of Schools and shall select by majority vote an Interim Operating Committee composed of nine (9) incumbent school directors. In selecting the Interim Operating Committee the incumbent school directors shall select no more than two (2) incumbent school directors from any single former district. The decision of the convention in selecting the Interim Operating Committee shall be final. Three (3) of the members of the Interim Operating Committee shall be selected for a term expiring on the first Monday of December, 1981, three (3) for a term expiring on the first Monday of December, 1983, and three (3) for a term expiring on the first Monday of December, 1985. In the event that an incumbent director is selected for a term on the Interim Operating Committee which would expire later than the term for which he was elected as a School Director, he shall serve only until the end of his term for which he was elected as School Director. At the municipal elections held in November, 1981, and at each municipal election thereafter School Directors shall be elected for six (6) year terms and shall take the place of the appointed members of the Board of School Directors of the newly established School District as their terms expire. The members of the Interim Operating Committee shall become and shall serve as the Board of School Directors of the School District on and after the date of its establishment as herein provided.

(5) The incumbent School Directors of the component former school district not selected for membership on the Interim Operating Committee shall serve in an advisory capacity to the Interim Operating Committee and to the Board of School Directors of the newly established School District. Such incumbent School Directors may attend meetings and participate in discussion of the Interim Operating Committee and Board of School Directors but shall have no vote.

(6) The Interim Operating Committee of the New School District shall develop a plan to divide the New School District into nine (9) regions. The boundaries of the regions shall be fixed and established in such manner that the population of each region shall be as nearly equal as possible and shall be compatible with the boundaries of election districts. Such plan for the division of the school districts shall be submitted for approval to the Court of Common Pleas of Allegheny County. If approved by such court the Clerk thereof shall be immediately certify the regional boundaries contained therein to the County Board of Elections. One (1) School Director who resides in each region shall be elected or appointed by and from each region and at all times each region shall be represented by a Director elected or appointed as herein provided from that region.

(7) The Interim Operating Committee shall have the power and its duties shall be to meet, prepare and adopt a budget, levy and assess taxes and perform all acts and functions necessary to enable the New School District to function properly from and after the date of organization of the Interim Operating Committee.

(8) The Interim Operating Committee shall have the power to fill vacancies should a vacancy in its membership arise due to death, resignation or otherwise provided, however, that the vacancy shall first be filled by the selection of an incumbent School Director elected by one of the component former school districts.

(9) The Interim Operating Committee shall have the power and its duties shall be to propose a name for the New School District. The name proposed shall be reported to the Department of Public Instruction which shall review the proposed name and approve it if it is not a duplication of a name previously approved by the Department of Public Instruction. When it approves a name, the Department of Public Instruction shall issue a certificate stating that the approved name has been registered as the official designation of the School District.

(10) The component school districts shall continue under the governance of their respective directors until June 30, 1981.

**8**

(11) All operating obligations of any component former school district contracted for current operating expenses until June 30, 1981 shall continue to be an obligation of the taxable property within such former component school district.

(12) On or before June 1, 1981, the representatives of the Pennsylvania Department of Education and the Allegheny County Intermediate Unit shall convene a meeting of the Interim Operating Committee to:

(i) assume the governance of the New School District;

(ii) organize the consolidation of the five former school districts;

(iii) establish the administration and provide for the financing of the New School District, and

(iv) take all actions necessary to prepare for the implementation of a plan of desegregation as set forth herein.

(13) The Secretary of the Pennsylvania Department of Public Instruction, or his designate, and the Allegheny County Intermediate Unit shall meet with the Interim Operating Committee of the New School District on or before the 15th day of June, 1981, to design a plan of desegregation and provide for its implementation with the beginning of the 1981–82 school year, and shall continue such planning until such plan is fully operational within the New School District.

(14) The plan of desegregation shall be designed and implemented in such a manner as to achieve and satisfy the greatest possible degree of actual desegregation, including desegregation of student enrollment, attendance, administration, faculty, staff, facilities, programs and activities. The plan shall be equitable in every respect and designed to achieve an equal sharing of the burden of desegregation between black and white students, parents and communities. The plan shall be designed not only to eliminate the effects of past discrimination but to the greatest extent possible, to prevent like discrimination in the future years.

(15) All of the provisions of the act of March 10, 1949 (P.L. 30), known as the "Public School Code of 1949", relating to school districts shall apply to this New School District.

(16) It shall be the primary responsibility of the Secretary of the Pennsylvania Department of Public Instruction, or his designate, to assure that a plan of desegregation is designed and implemented in accordance with the timetable set forth herein. In order to execute this responsibility the Secretary of the Pennsylvania Department of Public Instruction, or his designate, may take any action, consistent with this order and opinion, which it deems necessary to achieve the objectives set forth in this order.

(17) This court shall retain continuing jurisdiction over this action to oversee the planning and implementation of a program of desegregation; to enforce this order; and to enter such other orders as the court deems just and proper to effect a remedy.