Dorothy HOOTS, et al., Plaintiffs,

v.

COMMONWEALTH OF PENNSYLVANIA et al., Defendants.

Civ. A. No. 71–538.

United States District Court,
W. D. Pennsylvania.

May 12, 1982.

Thomas J. Henderson, Neighborhood Legal Services Ass'n, Pittsburgh, Pa., for plaintiffs.

Allen C. Warshaw, Deputy Atty. Gen., Chief, Civ. Liability, Harrisburg, Pa., for Com. of Pa.

Thomas M. Rutter, Jr., Pittsburgh, Pa., for Woodland Hills School Dist.

## OPINION

WEBER, Chief Judge.

Presently before this court are several student assignment plans which represent another step in the ongoing process of desegregating the school system now known as Woodland Hills School District.

The history of this case is extensively outlined in the prior opinions of this court as well as those of the United States Court of Appeals for the Third Circuit; and need not be repeated here. See: *Hoots v. Commonwealth of Pennsylvania*, 334 F.Supp. 820 (W.D.Pa.1972) ("Hoots I"); *Hoots v. Commonwealth of Pennsylvania*, 359 F.Supp. 807 (W.D.Pa.1973) ("Hoots II"); *Hoots v. Commonwealth of Pennsylvania*, 495 F.2d 1095 (3d Cir.), *cert. denied*, 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974) ("Hoots III"); *Hoots v. Commonwealth of Pennsylvania*, 587 F.2d 1340 (3d Cir. 1978)

("Hoots IV"); *Hoots v. Commonwealth of Pennsylvania*, 639 F.2d 972 (3d Cir. 1981) ("Hoots V"); *Hoots v. Commonwealth of Pennsylvania*, 510 F.Supp. 615 (W.D.Pa. 1981) ("Hoots VI"); *Hoots v. Commonwealth of Pennsylvania*, (W.D.Pa. 71–538, April 16, 1981) ("Hoots VII"); *Hoots v. Commonwealth of Pennsylvania*, (W.D.Pa. 71–538, April 28, 1981) ("Hoots VIII"); *Hoots v. Commonwealth of Pennsylvania*, 672 F.2d 1107 (3d Cir. 1982) ("Hoots IX").

The New School District, now known as Woodland Hills School District, was created by order of this court, dated April 28, 1981, which merged five formerly independent school districts into one. On July 23, 1981, the court ordered the school board to desegregate the secondary student population through the establishment of three high schools and three middle schools, beginning September 1981, and to take further actions to complete desegregation of the entire student population by the beginning of the 1982–83 school year. The actual assignment plan for secondary students was submitted by the Board in August 1981 and on August 13, 1981, this court permitted that plan to go into effect for only the 1981–82 school year.

Under the terms of the July 23, 1981 order, the School Board was to submit a plan for full desegregation, including elementary schools, to the court by December 15, 1981. The Board later requested an extension of time, which was granted, and the plan was filed on January 29, 1982. Plaintiffs also submitted a plan on February 8, 1982. The court held hearings on both these plans beginning March 2, 1982.

At the conclusion of these hearings, in a conference of counsel, the court indicated to the parties that, as presented, the court considered the Board's plan to be unacceptable and gave them until April 15, 1982 to present an alternative plan. The court further indicated that it was not ready at that time to adopt the plaintiff's plan, despite the obvious inadequacies of the plan submitted by Woodland Hills.

Both the School District and the plaintiffs have now submitted alternative plans. Plaintiffs' plan consists of five alternatives to its original plan, which differ in the student assignment patterns and building utilization in the eastern section of the new district. The common elements of all of plaintiffs' alternative plans were the use of the Scott building as a Middle School, the altering of the current Wilkins Middle School into an elementary center and the closing of the Eastmont Elementary School. Hearings on these plans began on April 23, 1982. Upon consideration of all the testimony presented to this court in March and April of this year, together with the vast amount of testimony and number of documents presented to the court over the years, we now stand ready to adopt a student assignment plan which will effectively desegregate the Woodland Hills School District.

In making a plan one postulate must always be kept in mind. Nothing in any plan considered by the court in any way interferes with or impedes the ability of the School Board and its employees to offer a high quality of education to all of its students in all of the schools in the District. We frequently heard the objection that the Board was considering quality of education in its proposals, and this they should do without question. The inferior quality of education rendered previously in component parts of this District to the predominantly black schools in the black residential areas through a neglect that was less than benign, points up the premise that it was the lack of quality education for these students that was the precipitating factor in this lawsuit. The statements about quality education in this case have never shown specifically how quality education is impaired by any desegregation plan considered.

■ In making our determination, we are mindful of the remedial standards that must be maintained in any school desegregation case. In Swann v. Charlotte-Mecklinburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the Supreme Court enumerated guidelines which are the governing standards in an effective desegregation remedy. The remedy must eliminate invidious racial distinctions. Swann, supra at 18, 91 S.Ct. at 1277. Specific affirmative efforts must be made to produce an integrated body of school personnel. Id. at 19–20, 91 S.Ct. at 1277–78. The plan must deal with school construction and abandonment in such a way that does not perpetuate or re-establish segregated schools. Id. at 20–21, 91 S.Ct. at 1278. And finally, the plan must achieve the "greatest possible degree of actual desegregation." Id. at 31, 91 S.Ct. at 1283. See also, Evans v. Buchanan, 582 F.2d 750 (3d Cir. 1978). With these general principles in mind, we will discuss the individual plans currently before the court.

■ At the outset, we note that the initial duty to eliminate a racially segregated school system lies with the school authorities themselves. The Board of Directors of Woodland Hills School District has the burden and responsibility to come forward with a plan that promises realistically to eliminate segregation. Swann, supra, 402 U.S. at 13–14, 91 S.Ct. at 1274–75, Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). This court has repeatedly stated and made every effort to allow the School Board to run its own affairs. The Board has been given every opportunity to come up with an acceptable student assignment plan, including several extensions of time. When it appeared that the plan submitted by the Board would not meet constitutional standards, they were given another opportunity to revise their plan to include those changes the court indicated were necessary.

■ The revised plan, however, continues to fall short of constitutional standards. We are under an obligation to insure that the constitutional violation found by this court is remedied, and due to the lateness of the hour, we cannot permit any more delays. When the local authorities fail in their obligation to provide a solution, it becomes the duty of the court to order a remedy.

In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system.

*Swann, supra,* 402 U.S. at 16, 91 S.Ct. at 1276.

The burden is on the School Board to show that the plans they have submitted are the most effective means of accomplishing complete desegregation. This burden is particularly heavy where other, more promising, proposals are available and before the court.

It is incumbent on the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation * * * [T]he availability to the board of other more promising courses of action ... places a heavy burden upon the board to explain its preference for an apparently less effective method [and] ... if there are reasonably available other ways ... promising speedier and more effective conversion to a unitary, nonracial school system [the board plan] must be held unacceptable.

*Green, supra,* 391 U.S. at 439–441, 88 S.Ct. at 1694–96.

We recognize that the Board has a heavy burden. The majority of its members were members of the boards of constituent school districts that consistently opposed any desegregation remedy that involved their districts and authorized appeals that are still pending. Even with the best of present intentions old loyalties are hard to forget. They are also under intense present pressures from individuals and groups who oppose any efforts to carry out the desegregation order, by open tactics of harassment and intimidation.

The Board has failed to meet the burden of proving that either of the plans it has submitted to the court is the most effective means of achieving complete desegregation. Therefore, we reject the Board's proposals.

The particular objections to the Board's proposals are well documented in the record and would be too voluminous to repeat here. We will discuss those failings of the plans which we consider to be the most crucial.

The Board's first plan, submitted January 29, 1982, has several major deficiencies. One of the first problems with this proposal is that it is a five year plan of which only the first year is detailed with any degree of certainty. Although planning for the future is commendable and necessary, it also means that complete desegregation would not be achieved for another five years. Also, the five year structure itself was extremely vague with no definite plan for specific steps to be taken each year. It was simply an outline of what they expected the configuration to be five years from now. Without specific commitments further delays might occur in the future, continually postponing complete desegregation. Any plan approved by this court must achieve desegregation now.

We note, however, that the plan's ultimate goal of a single high school for the District is a desirable one since that would necessarily assure desegregation at the high school level and unify the district. It is a concept that is highly desirable from the standpoint of quality education and equality of educational opportunity. Nothing in what the court now orders should prevent the School Board from continuing to plan for that ultimate goal as the student population declines over the years.

The overall deficiency with the Board's January 29th proposal is that it fails to eliminate racial distinctions and places the burden of desegregation on the black community. This result is evident in several fundamental aspects of the Board's plan.

First, the design of the District's plan does not result in an equitable sharing of the burden of desegregation. Generally speaking, it divides up the former General Braddock area into small groups of black students, who are then transported out to formerly white schools for their entire academic career, while only a small portion of white students are sent to schools away from their neighborhood. A look at the

map of the Board's plan reveals that the former General Braddock Area School District is divided up into a total of seven small areas, for the purposes of elementary school assignments. With the exception of those students assigned to Fairless Elementary, all the students from former General Braddock are assigned to formerly white elementary schools. Several of these small areas within General Braddock are "islands"; that is, they are racially identifiable pockets whose students are transported away from their neighborhoods to non-contiguous attendance areas for their entire educational career. These "islands" are totally surrounded by pockets of students attending other schools, and students from each island must cross another attendance area to reach their assigned school.

In contrast to this vast reassignment of black students relatively few of the white students are reassigned to formerly black schools and none of the white neighborhoods are broken up as are the black neighborhoods. Some white students are reassigned to the formerly black school, Fairless. But most other reassignment of white students is a result of the closing of some formerly white schools and involves assignment to other, predominantly white, contiguous schools.

The obvious result of this pattern is that the black neighborhoods become disjointed and disconnected with regard to the total school system. They bear the burden of reassignment imposed which often means transportation to schools far from their homes throughout their education. In contrast, the white neighborhoods are maintained as a cohesive unit and white students are assigned to schools within or very near their neighborhood. The transportation of white students does not involve as great distances as that for blacks and varies little from the amount of bussing that existed in the individual school districts prior to the creation of Woodland Hills.

Under the Board's plan, the burden of transportation and breakdown of community falls again on the black students during their secondary education. Some of the small pockets and islands created for elementary assignments are split again for secondary school assignments. This means that some black students would attend elementary school with one group of students and then be split apart and attend secondary schools with an entirely different group of students. This process occurs only among black students. The Board's plan would never similarly split white students who will attend school with the same elementary group throughout their education.

The Board's plan, then, places an unfair burden on the victims of the constitutional violation in three major respects. First, the plan generally speaking provides for only one-way bussing of black students away from their neighborhoods to white schools, while white students remain in their former neighborhood schools. Second, the black area of the District is dissected into small unrelated areas which must result in a breakdown of the black community into disjointed factions, while the white neighborhoods are maintained as whole communities. Finally, the alienation which results when groups of children are continually split apart and shuttled between schools with differing student bodies will fall primarily on black students, while white students continue their education as a cohesive group.

All three of these results of the Board's plan place an unfair burden on the black community. Furthermore, the overall dissection of the black neighborhood into small groups and the one-way bussing of these small groups of students into white communities perpetuates the racial distinctions this case was intended to eliminate. The black students would always be outsiders in the formerly white schools.

■ Therefore, we find that the overall design of the Board's January 29 plan of desegregation does not meet constitutional standards and is unacceptable. There are also certain specific aspects of the Board's plan which the court considers defective; in particular, building utilization and the retention of racially identifiable schools.

With regard to building utilization, the Board's plan calls for the closing of all but one of the buildings located in the former General Braddock Area School District, the identifiably black area of the new District. The Board recommends the retention of one elementary school, Benjamin Fairless School. General Braddock formerly had five operating school buildings; three elementary schools, Benjamin Fairless, Hartman and Rankin, and two secondary schools Braddock Junior High School and Scott High School. Both Braddock Junior High School and Scott High School were closed during the last year's implementation of the plan of desegregation of the upper grades due to superior conditions of the like schools in the other former districts which had sufficient space for all the students of the District. All parties agree with the Board's plan to close Hartman as an elementary school. The Board's plan also calls for the closing of Rankin, which would leave only Fairless as an operating school in the former General Braddock area.

Rankin Elementary is a school constructed in two sections. The Building Utilization Study conducted by an architectural firm on behalf of the school district reports that the original portion, called the McGrady Building, is an antiquated facility that should be closed. The newer portion, however, is in very good condition and currently houses most of the classroom space. The architects recommend that the McGrady Building be replaced to provide the necessary support facilities for the 1960 classroom addition.

Despite this recommendation of their own architects, the Board's plan calls for the closing of Rankin, while it maintains other elementary schools in the identifiably white districts which are not in as good condition; Atlantic, Bessemer, and Newmyer. In fact, the architects' report recommends that these three schools be closed by summer of 1982.

The court recognizes the importance of the presence of school buildings in a community. These structures serve more purposes than simply the housing and educa-tion of youngsters. They serve as a community focus for both parents and students and are often the center for various local activities. The closing of all but one of the schools in the identifiably black areas would eliminate such a community focus in the black neighborhoods.

We feel that such a result is inequitable and undesirable. Because there are alternatives before the court which will maintain at least two school buildings in the black community, we find this aspect of the Board's plan to be a serious defect. Under the Board's plan, the burden that results from the loss of buildings in the community falls too heavily on the black area. Furthermore, we wish to maintain the concept of neighborhood schools as much as possible. Under the terms of the Board's plan, with the retention of only one school building, neighborhood schools would be almost entirely removed from this part of the district.

Finally, when questioned by the court on the reasons for the Board's decision to close Rankin despite the architects' report to the contrary, the District responded that their decision was partially based on their belief that the use of that facility would result in resegregation since many white parents would opt out of the public school system rather than send their children to Rankin. The wishes of the parents in the predominantly white neighborhood is not a valid consideration in the adoption of a desegregation plan. The closing of formerly black schools for racial reasons is a prohibited form of discrimination. *Lee v. Macon County Board of Education*, 448 F.2d 746, at 753–54, (5th Cir. 1971).

■ Therefore, we find that the building utilization as proposed in the Board's January 29 plan places the burden of desegregation on the victims of constitutional violation.

■ The Board's plan is also defective in that it maintains racially identifiable schools. According to the plan, Fairless Elementary would continue to have a high percentage of black students, 54.5%. Two

elementary schools, however, remain predominantly white; Eastmont, with a nonwhite population of only 3.6%, and Electric Plan, with a non-white population of .3%. These two elementary schools, Eastmont and Electric Plan, are located at or near the edge of the Woodland Hills area, and are farthest away from the black community. Eastmont, in particular is located on the extreme northern boundary of the District encompassing an extensive but relatively thinly populated area whereas the black population is generally concentrated in the south central region. Presumably, due to distances, the District decided to exclude these schools from a desegregation plan for the elementary grades.

We find that the continuation of racially identifiable schools within the District is improper, particularly where many alternatives are available and there is no compelling reason to maintain such racial imbalance. One of the fundamental purposes of any desegregation plan must be to eliminate racial distinctions. Because the District's plan clearly fails to do this by maintaining three racially identifiable schools, it cannot be adopted by this court. Furthermore, any plan adopted must purport to achieve the greatest degree of actual desegregation in all schools. The continuance of racially identifiable schools clearly does not conform with this fundamental goal.

For all the foregoing reasons, we cannot adopt the Board's January 29 proposal. The Woodland Hills School District has also submitted revisions to the January 29 plan on April 22, 1982. These revisions were intended to cure some of the defects in the first plan that the court had earlier pointed out to the District. Upon review of this alternate plan and further testimony, we find that the revisions fail to correct the fundamental problems with the District's plan.

■ There are two major revisions to the plan made by the School Board. First, the student assignment plan has been altered to reduce the racially identifiable character of two elementary schools. Fairless would now have a non-white enrollment of 33.9%

as opposed to the 54.5% projection of the first plan. Electric Plan would have a nonwhite enrollment of 28.9% as opposed to the earlier project of .3%. This revision does reduce much of the racial distinction between schools. However, the revised plan continues to maintain Eastmont as a predominantly white school with a non-white enrollment of only 3.6%. Therefore, this revision only partially cures the problem of racially identifiable schools within the District.

■ The second revision involves the use of Rankin Elementary School as a voluntary magnet school and as the District's single site for its elementary gifted program. Gifted programs are required by the state and the consolidation of all the gifted programs into a single school would make it more economical and probably provide a better program. Because the type of specialized courses provided for the gifted students are the same as or similar to those offered in a magnet program, one building could easily accommodate both. The School District included the use of a magnet school to provide a use for Rankin, a building in the predominantly black area of the District, and because they believe it will promote desegregation. To make Rankin successful as a magnet school, the School Board recognizes that it would have to make efforts to make Rankin more attractive as a school than other facilities in the District. They feel this can be accomplished.

We do not find, however, that the addition of a voluntary magnet school cures the defects in the District's plan, other than providing a use for the Rankin facility. Initially, we note that one of the District's own expert witness has testified that the magnet school concept has not been effective in bringing about desegregation. In support of the magnet school revision, the Board's witnesses have testified that this will promote desegregation and stabilize the District. No one has shown us how or why this result should occur. The Board's proposal is still in an embryonic state. They have no projections on how many students

would be expected to attend this voluntary program, or how racially mixed this school might be. The plan is too vague and the effects on desegregation too speculative to be acceptable to this court.

Aside from the speculative nature of this proposal, we have serious doubts concerning the success of a magnet school program in achieving desegregation. Although students enrolled in the gifted program would be assigned to Rankin, the magnet portion of the program is voluntary. Since one of the Board's initial reasons for closing Rankin as an elementary school was the belief that white parents would object to sending their children to this facility, we question whether making it a magnet school would result in much voluntary participation by white students, no matter how good the program offered might be. Also, the necessary improvements to Rankin would take time to accomplish, and even more time would be required to alter the negative parental attitude towards Rankin, if it occurred at all. The success of this program would take time, and we are constrained to desegregate the schools of this District now.

Furthermore, gifted students would not attend all their classes at this facility. They spend varying periods of time there depending on their interests and needs. It is unknown whether students enrolled in the magnet program would be in continuous attendance or on a periodic schedule as in the gifted program. This periodic scheduling does not lend itself to development of close ties between children as does daily attendance with a single group. Therefore, although it may be desegregated in actual numbers, the magnet school/gifted program does not necessarily create a truly integrated school. Students would all be following their own particular curriculum on their own particular schedules and there may or may not be any meaningful educational contact between various groups of students.

Finally, and most importantly, even if the use of Rankin as a magnet school were successful and created a voluntarily desegregated atmosphere, it fails to cure the fundamentally defective design of the Board's plan. We have already explained why the patchwork design which results in one-way bussing is unacceptable. It inequitably places the burden on the black community and maintains racial distinctions. Neither of the two revisions to the Board's proposal, the new student assignment plan or the use of Rankin as a magnet school serves to rectify this major problem. Therefore, we must reject the revised plan of the School Board as well.

Upon rejection of the Board's plans, we must now turn to the plaintiffs' plans currently before us.

█ In order to be truly effective a plan of school desegregation should satisfy five basic requirements. First, that plan should be in effect and operating no later than the fall of 1982. Second, the plan should ensure that no racially identifiable schools remain within the Woodland Hills School District. Third, the desegregation plan must provide for an equitable allocation of the burdens of desegregation between the black and white communities. Fourth, any plan we adopt should, wherever practical, maintain as operating entities facilities within what has traditionally been the black community. Finally, and most importantly, any plan we adopt should ensure that Woodland Hills School District maintains the highest educational standards for all its students.

As we have noted above, the plans submitted by the District fail in several particulars to comply with these standards. We have concluded that the flaws in the District's plans are both fundamental and pervasive. We have afforded the District ample opportunity to correct these defects and they have failed to do so. Accordingly we have no alternative but to reject the District's plans and turn to the plans submitted by the plaintiffs for guidance in desegregating the Woodland Hills School District.

The plaintiffs have submitted six alternate plans for the desegregation of the elementary schools in the Woodland Hills School District. Although these alternatives differ in a number of particulars, as described below, they share several common

elements. All of these alternatives presented by the plaintiffs are designed for the specific purpose of desegregating the entire Woodland Hills School District by the beginning of the 1982–83 school year. In each of these alternatives the organization of the elementary schools is patterned after the arrangement presently employed in the secondary schools of the District. Specifically the elementary schools are arranged into three attendance patterns, each of which feeds students directly into one of the three secondary school systems already in place. Each of the plaintiffs' plans also utilize school facilities found within the black community. Moreover, each of the alternatives developed by the plaintiffs affirmatively seek to equalize the burdens of desegregation.

The burdens of desegregation are equitably distributed under the plaintiffs' plans by means of a technique called pairing or clustering. See generally, *Swann v. Charlotte-Mecklinburg Board of Education*, *supra*, 402 U.S. at 8–10, 24, 25, 27, 91 S.Ct. at 1272–73, 1280, 1281 for a discussion of the clustering methodology as a technique for school desegregation. Under this technique, elementary schools which are in close proximity to one another are clustered into one contiguous attendance zone. The elementary grades are then divided into two groups—primary grades, first through third and elementary grades, fourth and fifth. All of the students in the attendance zone are then assigned to one school for grades one to three and another for grades four and five. When these elementary attendance clusters are prepared with an awareness of the racial composition of a community, this methodology insures complete desegregation of all elementary schools. Moreover, by applying this clustering methodology a desegregation plan assures that all elementary students will spend part of their educational careers in a school close to home. Furthermore, when elementary schools are maintained in the black community, clustering guarantees that the white community bears some of the burden of desegregation. We note, however, that this burden on the white community is, at best,

a minimal one. For example under the six plans submitted by the plaintiffs at no time would any white student be required to spend more than two years in a school outside the white community. Nor does the clustering methodology contemplate excessive transportation of very young children. All elementary schools would retain kindergarten facilities. Therefore, kindergarten students would in all cases go to a neighborhood school.

Finally we note that clustering avoids one unfortunate result inherent in the plans submitted by the District. It prevents the division of the black community into numerous racially identifiable islands, each of which is transported away from home to identifiably white schools for the students' entire academic career.

Despite these clear benefits the clustering methodology was attacked at the hearings as a technique for achieving desegregation. The substance of this attack was essentially threefold.

First, it was alleged that clustering would substantially increase student transportation within the District. In school desegregation cases the phrase mandatory bussing invariably results in a highly emotional response. The question of mandatory bussing is perhaps the single most divisive issue in any school desegregation plan. It certainly presents the greatest single hurdle to community acceptance of a plan of desegregation. Few ideas are more readily calculated to lead to public resistance of a plan than the thought of small children being forced to travel great distances away from their homes.

The specter of mandatory bussing has frequently been associated with this case. Parents, public officials and the media have often framed the issues presented in this action in terms of bussing. This is unfortunate; but more important it is highly inaccurate.

Racial desegregation in the context of the Woodland Hills School District need not involve any bussing of children beyond that already done by the District. The area

comprising the Woodland Hills School District is relatively small, amounting to no more than 13.5 square miles. At its widest point the District is no more than 5 miles in diameter. Yet despite their extremely modest dimensions most of the former components of the District maintained extensive programs of student bussing for several years in their individual districts.

The record reveals that, prior to this court's merger order of April 28, 1981, over 65% of the students in what is now the Woodland Hills School District rode the bus to school. This extensive bussing program was designed to satisfy several distinct needs. In some instances, students lived more than 1.5 miles from the school they were assigned to attend. In these instances state law requires that the school district provide student transportation. A significant proportion of the student bussing conducted in this district, however, involved students who lived less than 1.5 miles from the school they attended. These students were provided with transportation to school because their route to school traversed one or more designated "hazardous routes". As described at the hearing, the designation of a route as a "hazardous route" generally resulted from parental petitions. Thus, in the vast majority of these cases, the district bussed children as a result of parental requests for bussing. To accommodate these transportation needs at least one of the former school districts maintained its own fleet of buses. Other districts relied upon private carriers to transport these students. All of these resources are available to and have been used by the Woodland Hills School District.

Given this history of extensive bussing within this District, we doubt that any plan of desegregation would require bussing beyond that presently provided by the administration. Furthermore we believe that the desegregation plans submitted by the plaintiffs are narrowly tailored with an eye toward limiting the transportation of students.

As we have noted all of the plaintiffs' proposals employ the clustering technique in desegregating the elementary schools. A central element of this clustering technique involves linking contiguous elementary schools together to form a compact attendance zone. Because clustering relies on attendance zones formed by contiguous schools, the distances between schools are minimized. With the elementary schools in close proximity to one another, the distance that students must be transported is also held to a reasonable limit.

This concept can be illustrated by examining the attendance zones established under the plaintiffs' proposals. In the western portion of the Woodland Hills School District it is suggested that an elementary cluster be created using the Dickson and Edgewood buildings as K–3 centers, with the Rankin school serving as a K 4–5 facility. These three buildings are in very close proximity to one another. For example the distance between Dickson and Rankin is only 1.3 miles; Edgewood to Rankin involves a slightly longer trip of 2.2 miles. (District Exhibit H). For many of the students living in areas between these school buildings the distance to be travelled is much less. Thus within this western attendance zone distance is not a significant problem and student transportation should not be excessive.

As one moves east through the District, distances between schools become more significant. This is, in part, a function of the geography of the District. The Woodland Hills School District is roughly fan shaped. The narrow end of the fan is found at the western extreme of the District. Moving east the fan expands reaching its greatest extension at the extreme eastern edge of the District. At no point, however, do we believe that these distances become so great that student transportation would be either excessive or impractical.

For example, in the central attendance zone the plaintiff proposes using the Churchill, Shaffer and Fairless schools as an elementary cluster. Churchill and Shaffer would serve as K–3 centers. Fairless would be a K 4–5 facility. These three schools are quite close to one another. The distance

from Churchill elementary to Fairless is only 2.7 miles. Shaffer to Fairless requires a trip of 3.2 miles. (District Exhibit H). Moreover, bus routes within this attendance zone are relatively short, ranging from 3.4 miles to 4.6 miles. These routes can be travelled in 10 to 15 minutes. (Affidavit of Dr. Gordon and Rev. Morse). Thus student transportation within the central elementary cluster could also be accomplished easily, without excessive bussing of any children.

In the eastern attendance zone student transportation presents the greatest difficulties. However, in the context of this relatively compact school district transportation, even in this eastern area, need not be excessive.

The plaintiff has presented several alternative elementary clusters which could be employed in the eastern portion of this District. These various plans involve the use of some combination of the following schools as elementary centers—Wilkins, Eastmont, Electric Plan and Bessemer. Under these proposals within this attendance zone the furthest distance between any two elementary facilities would be six miles and this extreme distance is due to the unfortunate location of the Eastmont School. Several schools in the eastern area are in fact quite close to one another. For example, the distance from Bessemer to the Electric Plan School is only 2.1 miles. (District Exhibit H). Nor would student transportation within this attendance zone constitute an undue hardship. The longest bus route within this zone should be no more than 7.2 miles. Several routes could be as short as 3.5 miles. Moreover the travel time for students should be minimal, ranging from a high of 20 minutes to lows of less than 10 minutes on several routes. (Affidavits of Dr. Gordon, Rev. Morse). Far greater distances have been required of students and parents in other desegregated school districts.

In sum, we believe that reference to mandatory bussing in the context of this school desegregation effort is highly misleading. Woodland Hills is an extremely compact District. Despite its compactness,

the District currently provides extensive bussing services to its students. Nothing we do should compel the District to provide student transportation far in excess of that currently taking place. By employing a clustering methodology we should, in fact, reduce the need for extensive transportation to distant schools. At any rate within the limited area of this District no transportation of greater than 7 miles at the utmost extreme should ever be required. These transportation requirements are reasonable. They provide for complete desegregation of the District without any undue hardship for any children. Accordingly we find this criticism of the plaintiffs' proposals unpersuasive.

The second criticism of the plaintiffs' plans is that the elementary schools within the black community would not be able to accommodate sufficient students for clustering to be effective. Under plaintiffs' plans two elementary schools—Rankin and Fairless—would be maintained in the black community. Both of these schools would be maintained as K 4–5 learning centers, housing all fourth and fifth graders in their respective attendance zones.

We have heard a great deal of conflicting testimony throughout these hearings about school capacities. At the outset we recognize that, over the long term, the problem of school capacity in the District will lessen considerably. Elementary school populations throughout the United States have been experiencing a steady decline over the past decade as the inevitable result of the reduced birthrate in this country.

This demographic phenomenon is reflected in the Woodland Hills School District. The rate of enrollment decline in that District over the past 10 years has been approximately 6% per annum. The District itself has acknowledged this phenomenon and planned significant reductions in the number of elementary facilities it intends to maintain. Presently the District operates 13 elementary schools. Because of this general decline in elementary enrollment the District contemplates reducing that number to 6 by the 1987–88 school

year. Therefore, over the next five years this general decline in enrollment should considerably reduce the problems of school capacity presently facing us.

For the next year, however, school capacity remains a crucial question. While we recognize that capacity is a legitimate concern for the school administration, we believe that the Rankin and Fairless buildings presently provide enough space for the operation of K 4–5 centers. We note that the capacity of both schools can be adjusted by simply altering class size from 25 students per class to 30. Testimony elicited at the hearings indicated that classes of up to 30 students were pedagogically acceptable. Thus, this increase in class size should not have any significant adverse effect on the learning process. In fact, the District itself currently operates classes of 30 students or more in both the Rankin and Fairless Schools. Beyond altering class size, specific accommodations can be made for students by imaginative use of the existing facilities. For example, at Rankin the McGrady wing of the school is a four story structure. Currently only two stories of the building are being used for educational purposes. By using available classroom space on the third floor of this building District officials could accommodate more students within the same physical plant. We are confident that the District can maintain the older wing of Rankin as an excellent facility, similar to their efforts at Bessemer and Edgewood.

Similarly the Fairless Elementary School is within walking distance of three other buildings currently owned by the District— Scott High School, Schwab Mansion and Braddock Junior High. It is immediately adjacent to the Schwab Mansion that presently serves as an administrative office of the District. It may be possible that certain programs scheduled for Fairless; specifically kindergarten, special education and ESEA, could be conducted on a short term basis at one of these other facilities. This action would make more space available in the Fairless building itself, and would reduce the number of students and programs making demands upon this space.

We are confident that the District can, with the existing facilities, establish operating, educationally sound, K 4–5 centers at Rankin and Fairless elementary schools. Therefore we must reject this second argument presented by the District in opposition to the clustering methodology.

Finally, the District has argued that the K–3/K 4–5 division is fundamentally unsound as an educational technique. This if true would be a very serious objection. Obviously, one of our primary goals in designing a plan must be the effective education of children.

We find, however, that this objection is not well founded. The question of the pedagogical effectiveness of a K–3/K 4–5 system has apparently never received serious scholarly attention. According to Dr. Herbert Walberg, the Board's own witness who opposed the proposal, no statistical analysis of the effectiveness of this grade configuration has ever been performed. Dr. Walberg was woefully unfamiliar with its successful use. A few general observations can be made, however, about this method of organizing elementary schools.

The K–3/4–5 division has been employed by many school districts without regard to desegregation. Moreover, the K–3/K 4–5 grade configuration has frequently been employed as part of a comprehensive plan of school desegregation. Such a configuration is now a recognized technique used in the reorganization of segregated schools. In several states, most notably Florida, the K–3/K 4–5 grade pattern is a common form of elementary school organization. In these states this division of primary and elementary grades has apparently been successful and has not resulted in any decline in the quality of education.

These K–3/K 4–5 elementary attendance patterns have also been successfully employed in Pennsylvania. At present some 67 school districts in this Commonwealth use precisely this type of elementary grade configuration. Testimony received at trial from Dr. Herbert Walberg indicated that, according to his survey of these schools, approximately one third employed this sys-

tem because they believed it to be educationally superior to a K–5 structure. This type of grade structure is also recognized by the Pennsylvania Department of Education, which has a separate certification for primary (K–3) teachers.

The validity of the K–3/K 4–5 grade structure is also demonstrated by the experience of the Woodland Hills School District itself. In his testimony before this court Dr. Wayne Doyle, the current superintendent for Woodland Hills, acknowledged that there is a natural division in school curricula between the third and fourth grades. According to Dr. Doyle typically the first three grades are devoted to the development of basic skills. Grades four and five then begin the process of teaching students to apply these skills to new problems. Thus a division of students between grades three and four would be consistent with the educational policy presently adopted by this District.

In fact, within the Woodland Hills School District such a grade configuration is currently being employed. The Newmyer School, located in what was formerly the Swissvale School District, serves as a K–3 center. Students from Newmyer attend the Dickson School for the fourth and fifth grades. Absolutely no evidence has been introduced which demonstrates that this grade configuration has adversely effected students attending the Newmyer School.

We conclude, therefore, that a K–3/K 4–5 system is an acceptable elementary grade configuration. We find that it is currently being used in many areas, including Woodland Hills. Furthermore we have been presented with no evidence which convinces us that this system is educationally inferior to a K–5 grade pattern. In fact, a substantial number of schools in this state which employ the K–3/K 4–5 system believe it to be educationally superior to the conventional elementary pattern.

We do recognize that this grade division may place an additional administrative burden on the officials of this District. These officials would have to exercise particular care in coordinating curriculum between the third and fourth grades. We do not believe, however, that these administrative difficulties justify abandoning what is in all other respects an educationally sound grade configuration. We are confident that the current administration is equal to the challenge of operating this type of elementary school system. Accordingly, we reject the District's third argument against the clustering methodology.

In summary, then, all of the plaintiffs' proposals recognize that a comprehensive plan of school desegregation should be in place by the fall of 1982. All of the proposals are drafted to ensure that no racially identifiable schools remain in this District. Finally, all six proposals use the clustering technique to equitably allocate the burdens of desegregation. Therefore all six of the plaintiffs' proposals adequately meet the first three criteria we find necessary for an effective desegregation plan. Accordingly it is the fourth criteria—maintenance of schools within the black community—which distinguishes these six proposals. Yet even on this point all six plans contain some common elements. All six plans submitted by the plaintiffs propose to use the Rankin and Fairless elementary schools as K 4–5 centers for the western and central attendance zones. The difference in these plans lies in their organization of the eastern (Turtle Creek) attendance zone.

Under the plaintiffs' original proposal the eastern zone was organized in the following manner: Eastmont and Electric Plan Schools would be retained as K–3 centers. Bessemer School would then be established as a K 4–5 facility. Students in the eastern attendance area would go to Wilkins Middle School for grades six through eight. Finally, Turtle Creek High School would house students in grades nine through twelve.

Under the five subsequent proposals submitted by the plaintiffs, Turtle Creek High School would continue to accept students in grades nine through twelve. The middle school for the attendance zone would be changed, however, from Wilkins to the Scott High School. In order to make this change the Scott Building would be reno-

vated and reopened. All five of the plaintiffs' alternatives contemplate that the Wilkins Junior High would be converted into an elementary facility. The five options then use Wilkins, in combination with Braddock Junior High, Electric Plan Elementary and Bessemer Elementary, as elementary centers. The Eastmont school is closed in all five proposals.

At first blush, the approach adopted in these five alternate proposals is attractive. The Scott Building is an available facility. Utilizing Scott in this manner would ensure that each attendance zone has a school in or near the black community. Moreover, the plan eliminates the Eastmont Elementary School, a building located in the northeast corner of the District. This building's remote location presents the single most serious transportation problem for the District. Therefore by eliminating this facility we could lessen the transportation burden on the District considerably.

Yet, despite these attractive features, we feel that we cannot adopt any of these five alternative proposals for the 1982–83 school year. Retention of active schools in the black community is just one of five requisites for effective desegregation. A program of desegregation, in order to be effective, must also be capable of implementation by the fall of 1982. Moreover, in fashioning a remedy for this constitutional violation we must consider the fact that the Local Board has a school district to run. In running this district the Board must make decisions that are both economically and educationally sound. The desegregation remedy which we forge should not unnecessarily complicate the Board's task in this respect.

All of plaintiffs' alternate proposals involve the returning to use of the Scott High facility and the transformation of the Wilkins facility to an elementary center. In this case we see many problems, both immediate and long term, with any proposal which retains the Scott Building as a school.

Turning initially to the short term consequences of these proposals, we have serious doubts that such an ambitious project could be completed by September of 1982. At the hearings held by this court, Mr. Clifford Foreman, the architect commissioned by the Board to perform a study of all buildings within the District, indicated that the Scott Building could not be prepared for use as a middle school before the 1982–83 school year even by a program of temporary repairs. According to Foreman in order to make the building usable as a secondary school, extensive renovations would be necessary; including roof repair, work on the plumbing, wiring and ventilation, plastering and painting. In addition it appears that much of the fixed equipment necessary for a complete middle school curriculum is either missing or antiquated. Replacement or renovation of this equipment—which includes laboratory facilities, woodworking equipment and a homemaking suite—would be necessary if Scott is to provide an educational program comparable to that existing in other Middle Schools in the District.

Moreover, the plaintiffs' second set of proposals would require that renovations also be performed at the Wilkins school in order to transform that facility from a middle to an elementary school. Essentially plaintiffs' second set of proposals requires that we: (1) reopen and renovate the Scott Building, preparing it for use as a middle school; (2) renovate the Wilkins Middle School, converting it to an elementary facility. All of this renovation would have to be completed in the four months which remain before the commencement of the 1982–83 school year.

In contrast, plaintiffs' initial proposal uses the existing facilities in this area of the District. It does not call for the reopening of Scott; nor does it require the renovation of Wilkins. Therefore, it seems a more reasonable, practical alternative given the time constraints under which this District must operate.

Economic factors also weigh against the retention of Scott as a Middle School. The costs associated with the renovation of Scott on a short term basis alone are considerable. It has been estimated that the preparation of the Scott building for use in

the fall of 1982 would cost the District between $500,000 and $700,000. Moreover these costs would only entail renovation sufficient to prepare Scott for the fall of 1982. Refurbishing the building for long term use would involve even greater expense, perhaps as much as $5,000,000. Onto these expenses one must also add the cost of converting Wilkins from a secondary to an elementary school.

Thus we can see that the plaintiffs' second set of proposals would require the District to undertake a significant capital improvements program. In light of the other excellent secondary school facilities available within the District, the wisdom of such a program is questionable. Moreover under the plaintiffs' initial proposal these same goals are attained without the necessity of a costly building renovation program.

Finally we are concerned that plaintiffs' second set of proposals, if implemented, would not provide the students attending Scott the same educational opportunities available elsewhere in this District by the fall of 1982.

Equality of educational opportunity must be a keystone of any plan we adopt. Accordingly failure to insure such equality of opportunity is a fatal defect in any proposal. We have been fully informed regarding the inadequacies of the Scott facility. The fact that much of that building's fixed equipment is either antiquated or missing presents a serious obstacle to the District in its efforts to provide a full range of educational programming. We have no assurance that these serious deficiencies can be cured in time for the 1982–83 school year. Therefore, this uncertainty regarding the ability of Scott to provide a complete secondary education casts grave doubt over the workability of all of plaintiffs' alternative proposals.

In essence, then, the combination of these educational, economic and pragmatic considerations militates heavily against any effort to incorporate Scott High into a plan of school desegregation for the fall of 1982.

When viewed in a long term perspective these problems become even more glaring.

Viewed in isolation Scott High appears to be an adequate secondary facility. In fashioning a remedial plan for this District however we must take a broader perspective; we must examine Scott in light of the other secondary schools available in the District.

Presently, there are six secondary schools in operation in the Woodland Hills School District. All of these schools are located on lots which are larger than that found at Scott. Maintenance of these schools has, in every case, been superior to that received by Scott High. With the exception of the older wing of the Edgewood Middle School, all of these buildings were constructed long after Scott. All of these schools, except Edgewood, have several play fields and on site parking. Scott includes one field, in poor condition, and has no parking facilities. Three of the secondary schools,—Churchill, Swissvale and Turtle Creek High Schools— are completely equipped with modern fixed equipment. Two other secondary facilities—Forest Hills and Wilkins Middle Schools—have fixed equipment that has been rated as adequate for a complete secondary school program. In contrast the fixed equipment at Scott is both inadequate and antiquated.

In sum, of the facilities now available in Woodland Hills for secondary students Scott is, educationally, the least desirable.

Moreover in the next five years the District contemplates a significant reduction in the number of secondary buildings it operates. Ultimately the District contemplates closing Forest Hills Middle School; converting Edgewood and Wilkins into elementary schools; and operating Turtle Creek and Swissvale as Junior High Schools. By 1987 Churchill would be the only high school in the District. In light of this contemplated reduction in secondary schools it seems both unwise and impractical to invest $5,000,000 to renovate what is presently an inferior building.

In reaching this conclusion we recognize the significance of the Scott building to the residents of the General Braddock community. That school has served as a focal

point for community activity for more than 50 years. We also sympathize with the parents of the General Braddock community, who for the past decade have watched their school decline as a direct result of official indifference. The tragic fact remains, however, that at present Scott High School is an inadequate facility. We also note that the loss to communities of long used school buildings is not unique to the General Braddock Area. All communities in this District will suffer this consequence as schools are closed due to declining enrollment.

The benefits derived from using Scott are, in our view, far outweighed by the costs, both economic and educational, of renovating that facility. Therefore we will reject all of plaintiffs' proposals which utilize the Scott building as a Middle School and order the District to implement an attendance plan for the 1982–83 school year which conforms with the original proposal submitted by the plaintiffs.

In taking this action we recognize that the attendance plan adopted today is by no means final. That plan is, by definition, only a plan for the 1982–83 school year. As school enrollment declines and student populations shift the Board and administration should feel free to exercise their best independent judgment in revising attendance zones. In exercising this judgment they should seek to attain the best educational environment for all students in the District.

One facet of the attendance plan we adopt today does deserve mention, however. Under the proposal adopted by this court, the Eastmont Elementary School is retained as a K–3 learning center. We take this action solely because we believe that it is necessary in order to ensure that a complete plan of school desegregation be in place by September 1982. We do not believe, however, that Eastmont should be considered as part of a long term plan of school desegregation.

The Eastmont School sits in the far northeast corner of the Woodland Hills School District. It is remote from any of the major population centers within the District and is far removed from the black community. Its location is extremely unfortunate and transportation of students to and from the Eastmont area is the single greatest burden on the District's bussing facilities. As school consolidations become necessary within the District we would anticipate that this building would be a prime candidate for termination. Such termination, in our view, would be consistent with good educational policy and a sound program of school desegregation.

Finally in reaching our conclusion, there is one other factor which we must address. We believe that this plan of school desegregation should provide all the students of the District with the greatest possible range of educational opportunities. In many respects this is the most important requirement of any plan. Ultimately we will have gained little over the past eleven years if the result we attain is a school district that cannot teach effectively.

Yet, despite its importance, this is one element of a desegregation plan over which we have little control. We have selected an attendance plan with the intent of establishing an educationally sound school system. But this act alone does not ensure the success of these schools. Ultimately people are what will make these schools work. Parents, students, teachers and administrators working in close cooperation are the keys to the success of this educational program.

The task ahead of this District is by no means an easy one. It will require hard work. It will demand the combined efforts of the entire community. Over the past decade we have become intimately familiar with the communities and people who comprise the Woodland Hills School District. We are aware that this District has a considerable wealth of human resources at its disposal. We are confident that these human resources are equal to the challenge of making the Woodland Hills School District a source of pride for all elements of the community.