703 F.2d 722
 10 Ed. Law Rep. 59
 Dorothy HOOTS, individually and as mother of her children,
Janelle Hoots and Jamie Hoots; Mrs. Addrallace Knight,
individually and as mother and natural guardian of her
children Ronald Knight, Loretta Knight, Terrance Knight,
Marc Knight and Byron Knight; Barbara Smith, individually
and as mother and natural guardian of her children Tawanda
Smith, Tevela Smith, Joseph Smith, Wesley Smith and Eric
Smith; on behalf of themselves and all others similarly
situated Mae Helen Woody, Juanita Jordan
v.
COMMONWEALTH OF PENNSYLVANIA; Edward X. Hallenberg,
President of the Allegheny County Board of School Directors;
the Allegheny County Board of School Directors; W. Deming
Lewis, Chairman of the Pennsylvania State Board of
Education; Michael Sullivan, President of the School
District of the Borough of Braddock; The School District of
the Borough of Braddock; Andrew Lisyak, President of the
School Board of Rankin; the School District of the Borough
of Rankin; Leo Campbell, President of the School Board of
the School District of the Borough of North Braddock; and
the School District of the Borough of North Braddock; the
Allegheny Intermediate Unit Board of School Directors; and
Edward X. Hallenberg As President of the Allegheny
Intermediate Board of School Directors, Churchill Area
School District, Edgewood School District, Swissvale Area
School District, Turtle Creek Area School District.
Appeal of BOARD OF SCHOOL DIRECTORS OF The WOODLAND HILLS
SCHOOL DISTRICT.
 No. 82-5342.
 United States Court of Appeals,
Third Circuit.
 Argued March 1, 1983.
Decided March 28, 1983.
 
 Thomas M. Rutter, Jr. (argued), Patrick J. Clair, Goehring, Rutter & Boehm, Pittsburgh, Pa., for appellant.
 Thomas J. Henderson (argued), Pittsburgh, Pa., Jack Greenberg, Bill Lann Lee, James S. Liebman, New York City, for appellees, Dorothy Hoots, et al.
 Before SEITZ, Chief Judge, and WEIS and BECKER, Circuit Judges.
 OPINION OF THE COURT
 PER CURIAM.
 
 
 1
 We are advised by the parties in this protracted school desegregation litigation that this eighth appeal on the merits, the sixth in two years, will be known as Hoots XIV.[1] Although many of these appeals have been preliminary skirmishes, this appeal, like Hoots v. Commonwealth of Pennsylvania, 672 F.2d 1107 (3d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 55, 74 L.Ed.2d 60 (1982) ("Hoots IX "), is a frontal assault on the district court's desegregation plan. The previous appeals were mounted by the Allegheny County Intermediate Unit, the Allegheny County School Board, the Commonwealth of Pennsylvania, and the former school districts of Edgewood, Churchill, Swissvale, and Turtle Creek. The four school districts are now merged with the General Braddock Area School District (GBASD) to create a new umbrella district known as "Woodland Hills," the appellant here. Although the appellants' names have changed, the essential arguments remain the same.
 
 
 2
 Appellant argues that the district court fully remedied the constitutional violations by creating a consolidated district and thereby exhausted its jurisdiction; alternatively, that the constitutional violation was resolved by establishing three standard feeder systems to secondary schools, thereby exhausting the court's jurisdiction and leaving it with no authority to issue orders governing elementary schools; and that the court abused its discretion by rejecting appellant's plan and substituting its judgment as to elementary school assignment patterns.
 
 I.
 
 3
 Repeating the factual and legal recitals already set forth in the reported opinions of both this court and the district court would serve no useful purpose. It is sufficient to state the law of the case and to update the history of the proceeding below. In Hoots IX we held that the district court applied the proper legal standard in determining that the creation of the predominantly black GBASD was an act of de jure discrimination, 672 F.2d at 1116, that there was sufficient evidence in the record to support a determination of intentional racial discrimination, id. at 1119, and that the district court's decision to consolidate five separate districts into one was not an abuse of discretion, id. at 1124.
 
 
 4
 During the pendency of Hoots IX-XI, the district court moved to implement the desegregation order. On July 23, 1981, it ordered defendant Woodland Hills to create three secondary/middle school feeder systems to replace the existing secondary and middle school systems and directed the board to prepare an elementary school desegregation plan for submission to the court by December 15, 1981. On August 13, 1981, the district court approved a 1981-82 student assignment plan for the secondary/middle school feeder systems.
 
 
 5
 At defendant's request the district court extended the submission date for the elementary school desegregation plan to January 29, 1982. Defendant submitted this plan, but the court found it unacceptable and directed defendant to revise it. On April 22, 1982, as defendant submitted its revised elementary school desegregation plan, plaintiffs also submitted several proposed elementary plans for the court's assistance.
 
 
 6
 On May 12, 1982, following hearings on the plans, the district court, 539 F.Supp. 335, found defendant's revised plan unacceptable. The court found many of the plaintiffs' plans to be acceptable, however, and directed Woodland Hills to draw up a final plan on the basis of plaintiffs' submissions. Woodland Hills complied with this order, but appealed to this court from the May 12 order.
 
 II.
 
 7
 The Hoots sequence is not our first contact with inter-district de jure segregation requiring creation of a new umbrella district. We confronted the same problem in Evans v. Buchanan, 555 F.2d 373 (3d Cir.) (in banc), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977), and in Evans v. Buchanan 582 F.2d 750 (3d Cir.1978) (in banc), cert. denied, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). In the present appeal, we find the Evans decisions particularly helpful for their definition of the standard of review.
 
 
 8
 We note that appellant casts its first two contentions in terms of district court jurisdiction. This requires some clarification. Appellant does not argue that the district court exceeded the dispute resolution power granted by article III of the Constitution and federal statute. This case, then, does not present a question of "subject matter jurisdiction" as that term is usually presented to this court. Moreover, appellant does not appear to contend that there was available an adequate remedy at law and thus that the court lacked "equity jurisdiction." Rather, appellant's arguments go to the authority of the court to fashion the specific remedies imposed.
 
 
 9
 Therefore, notwithstanding appellant's labelling of its theories, we examine the district court's judgment not with the plenary review appropriate to review for error in subject matter jurisdiction, but search instead for indications that the district court abused its discretion. We defined that standard with specificity in Evans, emphasizing that as a reviewing court we are not empowered to consider remedial orders de novo, that where there has been intentional segregation the fashioning of a remedy is committed to the exercise of the district court's discretion, and that "a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." 555 F.2d at 378 (quoting Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15-16, 91 S.Ct. 1267, 1275-76, 28 L.Ed.2d 554 (1971)). Thus, in the formulation of orders seeking to remedy the vestiges of intentional segregation, "an improper use of discretion exists only when the judicial action is arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used." 555 F.2d at 378. See also Evans v. Buchanan, 582 F.2d at 760.
 
 
 10
 As a component of our review for abuse of discretion, our standard for examining the district court's fact finding is the familiar clearly erroneous rule. Dayton Board of Education v. Brinkman, 443 U.S. 526, 534 n. 8, 99 S.Ct. 2971, 2977 n. 8, 61 L.Ed.2d 720 (1979) (Dayton II ). It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data. Krasnov v. Dinan, 465 F.2d 1298, 1302-03 (3d Cir.1972). Mindful of the foregoing, we turn now to appellant's contentions.
 
 III.
 
 11
 Appellant's first two arguments concern the extent to which the district court may exercise its remedial authority. Because they share the same basis, we will discuss them together.
 
 
 12
 Injunctions issued to enforce school desegregation orders are part of the equity powers of federal courts, and the scope of these remedial powers is broad. In Swann, the Supreme Court reiterated that state-imposed segregation by race in public schools denies equal protection of the laws, 402 U.S. at 15, 91 S.Ct. at 1275, and that "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies," id. The federal court's equitable powers are not unlimited, however, and the "nature of the violation determines the scope of the remedy." Id. at 16, 91 S.Ct. at 1276. See also Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); Evans v. Buchanan, 555 F.2d at 379-80.
 
 
 13
 Thus, the proper focus in determining the appropriateness of an equitable remedy is an inquiry into the nature and extent of the constitutional violation. Appellant essentially argues that the constitutional violation present here consisted entirely of the creation of GBASD as a racially segregated district. Therefore, appellant continues, the scope of the remedy should be limited to erasing the illegally drawn school district boundaries and making GBASD a component of Woodland Hills. Beyond that, it argues, the district court had no remedial authority.
 
 
 14
 The thrust of appellant's argument is effectively that the violation was in only the creation of the district and not in the racial composition of the schools therein, and that as to the schools themselves, the court lacks any authority to order their desegregation. Thus, even though the illegal line drawn by the Commonwealth may be erased by the court, in actuality, within the consolidated district, appellant would have us treat GBASD and its students as though the line were indelible.
 
 
 15
 Such a result would be incompatible with the district court's findings and our past holdings. It has been determined that the constitutional violation consisted of more than the drawing of boundary lines between school districts. We have held expressly that "the State and County Boards intentionally created GBASD and its neighbors as identifiably black and white districts," Hoots IX, 572 F.2d at 1120, with both the purpose of "guarding the white communities [and students] from [the black communities and students of] Rankin, Braddock and North Braddock," id. at 1115, and the effect of "maximiz[ing] racial segregation in the public schools of the central eastern portion of Allegheny County," id. at 1116.[2] Thus, we must reject appellant's argument that a remedy embracing student assignments that cross the former district lines exceeds the scope of the violation.
 
 
 16
 Appellant argues in the alternative that even if the constitutional violations required student assignment, that requirement was satisfied by desegregation of the secondary schools. Accordingly, appellant contends that the district court exceeded its authority by ordering the submission of an elementary school desegregation plan. The major premise of this argument, however, is not supported by the facts set forth in the host of reported opinions in the history of this case. This court and the trial court have established: (1) that defendants' initial districting decisions "cause[d] and perpetuate[d] segregation," 672 F.2d at 1118; (2) that "the County and State Boards refused to give consideration to the foreseeable and avoidable adverse educational and racial effects [of segregation]," 359 F.Supp. at 818; (3) that defendants' policies "promoted no interest other than racial segregation," 672 F.2d at 1118; (4) that the defendants "intentionally created GBASD and its neighbors as identifiable black and white districts," id. at 1120; (5) that the "Boards maximized racial segregation within the schools of this central eastern portion of Allegheny County," 359 F.Supp. at 819; and (6) that "the natural, foreseeable and actual effect of [this] was to perpetuate, exacerbate and maximize racial segregation," id. at 821.
 
 
 17
 These findings and conclusions indicate that the underlying problem was invidious segregation in the school system as a whole. Recognizing the scope of the problem, we stated in Hoots V that "[r]egardless of the particular plan chosen by the district court, the remedy must be broad enough to completely eradicate the de jure discrimination found by the trial court in Hoots II." 639 F.2d 972, 980 (3d Cir.1981) (emphasis added). This direction is in keeping with the Supreme Court's admonition that the purpose of remedial school desegregation orders is to eliminate segregation "root and branch." Green v. County School Board, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). Upon finding system-wide discrimination, a court may exercise its sound discretion to include elementary schools in the remedy. Kelley v. Metropolitan County Board of Education, 687 F.2d 814 (6th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983). We find no abuse of discretion here.
 
 IV.
 
 18
 Appellant's final contention is that even if the district court had the authority to inquire into and order the desegregation of all of the district's schools, it abused this discretion by rejecting the desegregation plan that appellant submitted. We disagree.
 
 
 19
 The district court stated that an acceptable plan should be in effect and operating no later than the fall of 1982, which would insure that there are no racially identifiable schools in the district, provide for an equitable allocation of the burdens of desegregation between the black and white communities, and maintain operating facilities in the black communities. 539 F.Supp. at 343. Appellant does not challenge these criteria.
 
 
 20
 In evaluating the first plan submitted by appellant, the district court found it deficient because it was vague, it postponed complete desegregation for five years, it maintained at least three racially identifiable schools,[3] and it placed the burden of desegregation on the black community. Under this plan, virtually all of the busing would be of black children into formerly white schools and virtually all of the facility closings would be in the black communities. Appellant's revised plan, although moderating the extent of racially identifiable schools, only partially cured that major deficiency. It also did nothing to shift the desegregation burdens from the black communities to the white. Therefore, we agree with the district court that the deficiencies in the Woodland Hills plans made the plans incompatible with the goal of complete eradication of the constitutional violation.
 
 
 21
 In contrast, the district court saw merit in the desegregation plans offered by plaintiffs. The key to these plans was the clustering or pairing of formerly white and black elementary schools within each of the already established secondary/middle school feeder systems. Desegregation was to be achieved by combining the student populations of the formerly segregated school units and distributing the resultant population on a racially proportionate basis. Plaintiffs' proposals would immediately desegregate the district, equitably distribute the busing and facility closing burdens, and result in no racially identifiable schools. These findings are supported by evidence and are not clearly erroneous.
 
 
 22
 The Supreme Court has stated, "[i]n default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy." Swann, 402 U.S. at 16, 91 S.Ct. at 1276. Because the Woodland Hills board could not produce an adequate remedy, it was a proper exercise of discretion for the court to reject Woodland Hills' plan and replace it with a plan based largely on plaintiffs' proposals.
 
 V.
 
 23
 We have considered all of appellant's contentions and have found them wanting, but we are impelled to comment further. After eight appeals to this court, the residents of the Woodland Hills School District surely must be conscious of the expense of constant litigation. More importantly, by now there surely must be an awareness of the social costs. Persistent litigation can tear apart the social fabric of the community and threaten the intercultural understanding that is often fragile even in the best of economic times. The court earnestly solicits the interested parties to turn away from further litigation and for the sake of the children and the community strive to make the changes work.
 
 
 24
 The judgment of the district court will be affirmed in all respects.
 
 
 
 [1]
 Other decisions include: Hoots v. Commonwealth of Pennsylvania, 334 F.Supp. 820 (W.D.Pa.1972) ("Hoots I "); Hoots v. Commonwealth of Pennsylvania, 359 F.Supp. 807 (W.D.Pa.1973) ("Hoots II "); Hoots v. Commonwealth of Pennsylvania, 495 F.2d 1095 (3d Cir.), cert. denied, 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974) ("Hoots III "); Hoots v. Commonwealth of Pennsylvania, 587 F.2d 1340 (3d Cir.1978) ("Hoots IV "); Hoots v. Commonwealth of Pennsylvania, 639 F.2d 972 (3d Cir.1981) ("Hoots V "); Hoots v. Commonwealth of Pennsylvania, 510 F.Supp. 615 (W.D.Pa.1981) ("Hoots VI "); Hoots v. Commonwealth of Pennsylvania, No. 71-258 (W.D.Pa. April 16, 1981) ("Hoots VII "); Hoots v. Commonwealth of Pennsylvania, 545 F.Supp. 1 (W.D.Pa.1981) ("Hoots VIII "); Hoots v. Commonwealth of Pennsylvania, 672 F.2d 1107 (3d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 55, 74 L.Ed.2d 60 (1982) ("Hoots IX "); Hoots v. Commonwealth of Pennsylvania, 672 F.2d 1124 (3d Cir.1982) ("Hoots X "); Hoots v. Commonwealth of Pennsylvania, 672 F.2d 1133 (3d Cir.1982) ("Hoots XI "); Hoots v. Commonwealth of Pennsylvania, No. 71-538 (W.D.Pa. March 31, 1982) ("Hoots XII "), aff'd mem., 696 F.2d 982 (3d Cir.1982); Hoots v. Commonwealth of Pennsylvania, 539 F.Supp. 335 (W.D.Pa.1982) ("Hoots XIII "). In addition, we denied applications for writ of mandamus in Hoots v. Weber, No. 79-1474 (3d Cir. May 2, 1979), and Hoots v. Weber, No. 80-2124 (3d Cir. Sept. 9, 1980)
 
 
 [2]
 Details of the constitutional violation are set forth variously in 359 F.Supp. 807 (W.D.Pa.1973), 510 F.Supp. 615 (W.D.Pa.1981), 545 F.Supp. 1 (W.D.Pa.1981), and 539 F.Supp. 335 (W.D.Pa.1982)
 
 
 [3]
 Fairless (54.5% black), Eastmont (96.4% white), and Electric Plan (99.7% white). 539 F.Supp. at 341-42